# Letter of Intent

BETWEEN

Strategic Water Solutions, LLC

AND

Carl B. Wirt

This Letter of Intent (LOI) is intended to define a basic understanding between Strategic Water Solutions, LLC (SWS) and Carl B. Wirt. The intent of both parties is to execute the LOI and enter into a formal agreement, formation and funding of Wild West Water Solutions, Inc., a Texas C-Corporation.

## OVERVIEW

"WWW, Inc." will provide services for processing of wastewater in the oil and gas industry, and is seeking to secure funding for the acquisitions, operations of saltwater disposal facilities and other related services. "WWW, Inc." will also be advancing the wastewater technology into other verticals when opportunities are identified and agreed upon. "WWW, INC." has been established and a final Operating Name is to be decided on within 30 days.

Carl B. Wirt is investing in "WWW, INC." with the purpose of acquiring existing saltwater disposal facilities, adding wastewater infrastructure/technology, and developing a significant water infrastructure serving the oil and gas industry.

## LEGAL STRUCTURE

SWS and Carl B. Wirt agree to formalize "WWW, INC." for the purpose of acquiring existing Saltwater Disposal Facilities (SWD), Sales, Leasing and Licensing of any related business or businesses conducting water-related services in the oil and gas industry and future verticals to be identified later.

The legal structure to be formalized is a C-Corporation in the State of Texas. "WWW, INC." will be formed with the following allocation of stock.

- SWS          65%
- Carl B. Wirt    35%
- John Davis's consideration to be addressed in separate document

Management responsibilities for "WWW, INC." will be conducted by with the current management team as follows:

- Jonathan Koster     Chief Executive Officer
- David West        Chief Operating Officer
- John Davis        Chief Strategy Officer
- Britt Wirt        Chief Investment Officer

First order of business will be to acquire an existing saltwater disposal well (SWD) as identified in Addendum A, which is incorporated herein by reference.

1

Plaintiffs' Exs 1

Voting Rights          (5 Seats for Board of Directors)

- 2 Seats are designated to Jonathan Koster
- 2 Seats are designated to  Carl B. Wirt
- The 5th Seat will be nominated by JK and BW for Board Approval at end of year 1 of this agreement.

## TERMS

Carl B Wirt agrees to fund "WWW, INC." for a total cash amount of $1,050,000, and extend a Line of Credit for $300,000 according to the following Tranche Schedule:

| | | | |
|---|---|---|---|
| Tranche 1: | $700,000 cash | Day 1 | for acquisition, renovation and operation of "SWD" in Addendum A also includes a Sales Exclusivity Fee of $200,000 to "SWS". |
| Tranche 2: | $150,000 cash | Day 30 | for continued renovation and operation of "SWD" in Addendum A $50,000 will be allocated to "WWW, INC." Includes a Second payment for Sales Exclusivity of $100,000 to 'SWS'. |
| Tranche 3: | $200,000 cash | Day 90 | Final payment for Sales Exclusivity of $200,000 to "SWS". |
| Line of Credit: | $300,000 debt | Day 60 | for continued operations, as identified and approved, of "WWW, INC." Disbursement must be approved by Carl B. Wirt and Jonathan Koster.  Monthly internal administrative, billing processes and policies are to be in writing within 15 business days of closing. |

## ADDITIONAL ITEMS

SWS:   Valuable Consideration

Both parties agree the value of the knowledge and network of relationships "SWS" has developed in the oil and gas industry is significant in both time and money, which "WWW, INC." will benefit from in addition to the acquisitions of future sites, sales and licensing.

Carl B. Wirt agrees that $500,000 of the initial investment, as outlined above, will be for valuable consideration and Sales Exclusivity to "WWW, INC." in perpetuity.   Disbursement and terms of Sales Exclusivity Consideration are documented above.  Pipeline is separate and identified as sales in process and to be documented by "SWS" within 7 business days of LOI execution.

"SWS" agrees to provide exclusivity to "WWW, INC." in the Sale/Lease/Licensing of the Products/Services it offers as outlined below:

- Exclusivity Fee:  $500,000
- All Products and Know-how provided by "SWS" are to be made available to "WWW, INC."
  - Products will be sold to "WWW, INC." at Cost +10%, to be open-book with supporting documentation.
- Projects with Frost Rains Holdings, LLC. Are exempt in relation to all *NEW* site development.

Plaintiffs' Exs 2

**SWS:** Focus

"SWS" commits to remain solely focused on growing "WWW, INC." exclusively in water-related products, sales, licensing, leasing and services within the oil and gas industry. All "SWS" projects in the oil and gas industry, with the exception of *"NEW"* building projects funded by Frost Rains Holdings, LLC, will be operated by "WWW, INC." during the term(s) of its exclusivity. Jonathan Koster and David West have a fiduciary responsibility to "WWW, INC." for a period of 36 months, during which time their involvement outside of "WWW, INC." will be limited to advisory roles and not daily management responsibilities.

**SWD:** Sales & Marketing Pipeline

Compensation to "SWS" for business development and existing pipeline efforts made prior to formation of "WWW, INC." will be executed on "WWW, INC." paper and paid to "SWS" according to the terms and commission rates listed below.

- "SWS" will define Pipeline contact list with qualified customers, strategic partners and Investors within 7 business days of LOI Signatures.
- "SWS" Pipeline rights to commissions are for a period of 12 months or a max of $10M, whichever occurs first, from date of "WWW,INC." funding
- Applies to Licensing Fees, Product Sales and any Monetization of a Contracts or Tax Credits
- Applies to initial Point of Sale Amount, but not any royalties or residual revenue generated
- Does not apply to Lease and Service Agreements, this is "WWW, INC." Business
- Does not apply to Residual Revenue this is "WWW, INC." Business
- All existing Pipeline deals will be executed on "WWW, INC." Paper. "WWW, INC." will disburse the 65% Commission based on Gross Margin to "SWS". (GM = Point of Sale Amount – Hard/Soft Costs)
- 35% of Gross Margin is retained by "WWW, INC.".

**John Davis:** Valuable Consideration

Both parties agree that John Davis (JD) has provided services of value to the transaction outlined in this LOI. In exchange for these services, JD will be compensated as follows:

- Finder's Fee:                    $50,000
- Ramp up time, Salary          TBD (outlined already in preliminary discussion)

**ACKNOWLEDGMENTS**

- Both parties acknowledge that the terms of this LOI are for the sole investment in "WWW, INC.".
- Items to be discussed and solidified in the final contractual agreement are:
  - Reporting Schedules              (i.e. Financial Statements, Board Cadence)

**NEXT STEPS**

- Execute LOI
- "WWW, INC." Formalized and Executed
- Initial funding of Tranche 1

Plaintiffs' Exs 3



------ Signature Page ------

**CONTACT**

Strategic Water Solutions, LLC
Jonathan@strategicwatersolution.com
(214) 724-3889

Jonathan Koster, Manager
Strategic Water Solutions, LLC
September 7, 2016

Britt Wirt
Britt@onesourcevirtual.com

Britt Wirt,

September 9, 2016

4

Plaintiffs' Exs 4

## ADDENDUM A

### "Jenkins" Well
### Site Acquisition

First order of business for Wild West Water Solutions Inc. ("WWW, INC.") will be to acquire an existing saltwater disposal well "SWD", with the identified site being "Jenkins Well" located in Andrews, TX. Board approval is assumed for this site.

Deal Summary:

- The "Jenkins" disposal well will be acquired for $1,000,000
- $300,000 Cash
- $700,000 Note to be held by Oilfield Water Logistics, LLC.
  - Terms of Note: 5 years @ 10%
- Site Improvements to be identified and installed as needed
- Water Filtration equipment to be installed to drive clean water initiatives as Site Per Barrel Volume supports lease/purchase of said equipment.
- Immediate increase in disposal volume and water sales have been identified and are in active discussions. "SWS" would categorize these opportunities as in final stages of negotiations.
- "WWW, INC." is responsible for day-to-day operations/management of the site.
  - All purchases over $10,000 need to be discussed between Koster and Wirt
  - Policy of $10,000 transaction limit will be reviewed 6 months from execution of agreement

All due diligence is complete

- Well tested and results verified
- "As is, where is" acquisition
- Books and accounting verified
- Pumps tested and results verified

All appropriate contracts and entities are being formalized.

Deal Structure on Disposal Well:

- New Entity Formed – "Jenkins 1, LLC"
- Jenkins 1, LLC acquires the well
- "WWW, INC." - 50% interest in Jenkins 1, LLC with $200,000 investment
- Spec 3, LLC (Rio Red Entity) – 50% interest in Jenkins 1, LLC with $200,000 investment
- Jenkins 1, LLC collects disposal fees and oil sales only
- "WWW, INC." will manage operations and finances for this site
- Operator License entity to be formalized

Deal Structure on Water Sales:

- "WWW, INC." - 100% interest in water and brine sales with $175,000
- "WWW, INC." - With increased water sales opportunities, board shall approve $125,000 in capital improvements to expand operations
- Operator License entity to be formalized

Plaintiffs' Exs 5

-------- Signature Page --------

Strategic Water Solutions, LLC
Jonathan@strategicwatersolution.com
(214) 724-3889

Jonathan Koster, Manager
Strategic Water Solutions, LLC
September 2, 2016

Britt Wirt
Britt@onesourcevirtual.com

Britt Wirt, _____

September 2, 2016

Plaintiffs' Exs 6

# Strategic | **Water** | Solutions



A Custom Water Solutions Provider

Plaintiffs' Exs 7

Strategic Water Solutions, LLC has invested over four years in the research, development and field testing of equipment and systems for wastewater processing in the oil & gas industry. The initial company focus was to build traditional saltwater disposal wells (SWD), but have since evolved into a customized water solutions provider that utilizes effective technologies within a disruptive business model. The shift in focus was primarily due to the fact that as we became more educated in the process, we did not like disposing of fluids in the traditional manner of downhole injection. From a business perspective, we anticipated that in time the general public would feel the same and oppose the current business practice of salt water disposal wells. Our customized solutions provide operators and service providers a unique opportunity to target specific water challenges and needs, rather than trying to use a "one-size-fits-all" product.

Our guiding philosophy in developing solutions for water treatment:

- Cost-effective Operations
- New Revenue Generation
- Eco-friendly Platform

**Water Synergy**



The SWS business model aims to achieve all three value drivers.

## The Opportunity

Water management is an essential component for the oil and gas industry, yet is often looked at as nothing more than an expense. The size of the opportunity to provide more efficient and effective cost-savings solutions is substantial when water management is approached from a global operations perspective. A "beginning to end" approach in assessing an operator's water system often reveals significant opportunities to reduce operational expenses, and in many cases, generate new revenue.

The timing is ideal to be established as an innovator to a crucial component of the industry. With the precipitous drop in the price of oil, the industry as a whole is grasping for solutions to operate in a more cost-effective manner. Of even greater consequence, the industry is ill-prepared to operate in an eco-friendly manner that can avoid increased costs associated with imminent regulations. Intense backlash from residents of many states, Oklahoma in particular, has left many state governments in a desperate position to find a solution to continue to process their wastewater and still offer the oil and gas operators a cost-effective solution. The answer is above-ground remediation.

We are currently completing construction for the first of a 12-site package of Above-Ground Water Recycling Facilities that will process 10,000+ bbl/day at an average capital expenditure of $4-$5M, with operations for site 1 expected to commence by the end of April. Sites 2 and 3 are located in Orla, TX and will begin construction in May. The permit process with the RRC and TCEQ has been thorough and exhaustive, as we intentionally laid a foundation to set the industry standard for future permitting requirements of wastewater recycling facilities.

SWS is committed to providing solutions in optimized water management for the oil & gas industry. We are seeking to partner with strategic leaders who will help establish best practices that provide <u>both</u> a substantial reduction in operating expenses, while adhering to high environmental standards. While the straight-forward economic model is profitable, the marketing power that will reward the innovative and forward-thinking approach has a major multiplier potential.

Plaintiffs' Exs 8

## Industry Problems

- Limited Strategic Water Management Practices
- Disposal Well Pressure Issues
- Chemical Costs in Water Treatment
- Hydrocarbons Lost in Disposal
- Limited Water Supply
- High Capital Expenditures (multiple SWDs)
- Environmental Regulations

## SWS Solutions

- 10,000+ bbl/day  (per unit based on water make-up)
- Water Recycling Facilities can be scaled up
- Low Energy Usage
- Conservation of Water Usage
- No Chemicals
- Mobile
- Unlimited Capacity over time
- Special Separation Technology
- 99% Bacteria Elimination
- 99% Total Suspended Solids Removal (TSS)
- 99% Recovery of Hydrocarbons
- 20-30% Reduction in Total Dissolved Solids (TDS)
- Positioned to thrive with Recent Legislation  (i.e. State of Oklahoma)

## Equipment

All of the **SWS** filtration systems are skid-mounted for either stationary or mobile-site use. Each system is developed and sized for capacity; with state-of-the-art point of use controls. The technology encompasses low to medium flow filtration for water processing, with pressure rarely exceeding 60 psi. Equipment for a standard package will include a series of different sized micron filters, specially-treated ceramic membranes, centrifugal pumps, flow meters, pressure sensors and electronically activated valves with a fail-safe free flow fluid path. Additional technologies are incorporated in situations where unique issues need to be addressed. Each solution is customized for optimal results.

Plaintiffs' Exs 9







Plaintiffs' Exs 10

## Technology

The base technology of SWS is a ceramic membrane with a proprietary coating that functions primarily as a method to "de-water" the wastewater. Ceramic membranes have been used for many years as a medium to process water, but are unable to handle any type of water with heavy particulate without clogging up. SWS utilizes a proprietary coating that separates the organics from water, and allows each element to be re-used or recycled, adding tremendous value to what traditionally is disposed of as waste.

- Ceramic membranes with proprietary coating that enhances the functionality
- Coating is Organophobic and Hydrophilic
- Organics (bacteria, hydrocarbons and other water fouling constituents) CAN'T pass through the membranes
- Water CAN pass through in a cleaned state, free of organics and chemicals
- Does NOT require centrifuges, chemicals, pH altering or other expensive and labor-intensive processes
- Coating prevents membranes from fouling, resulting in increased production and reduced maintenance costs
- Two outputs: Permeate (clean water) and Concentrate (mix of hydrocarbons and waste)



## Key Benefits of Membrane Filtration Technology

- Consistent water quality output with a varying quality feed water
- 99% removal of reservoir damaging bacteria from the water
- No chemicals are used ("green" process)
- pH levels between 4 and 12 do not affect the filter properties
- Minimal moving parts (feed pump, recirculation pump)
- The technology prevents filter fouling, which reduces downtime and costs
- Low energy cost (50-70 psi differential pressure)
- Less than .08 ppm of TSS remaining
- Scalability to handle multiple applications and volumes



Plaintiffs' Exs 11

Solutions provided by SWS to address the water needs of an operator can be customized to address any scenario, but the primary models are one of the following:

## Water Recycling Facility

- 10,000 – 15,000 bbl/day
- Off-lease
- Commercial SWD replacement
- $4M - $5M average cost

## Water Recycling HUB

- 15,000+ bbl/day
- On-lease
- Hard-pipe water from various sites to HUB
- Cost is TBD (less expensive than building multiple sites)

## Mobile Recycling Units

- 5,000 – 15,000 bbl/day
- In-field
- $3M - $5M average cost

We offer an alternative to traditional disposal wells, locating Water Recycling Facilities within close proximity of major Operators. Each facility is designed in a similar fashion to a traditional saltwater disposal well, with the exception of replacing an injection well with above-ground water treatment technology. This allows us to remain modular and flexible to relocate as drilling activity moves. The physical plant allows us to process 10,000 – 15,000 barrels of water on a daily basis. The above-ground Water Recycling Facility is the imminent evolution of the traditional Disposal Well, delivering superior results in an environmentally-friendly manner above ground.

For operators with heavy activity in a certain geographical area, a larger recycling facility that can scale up to handle 15,000+ barrels of water daily is also an option. An assessment of the regional water management needs will allow us to propose an adequate water infrastructure that may utilize hard-piping.

SWS has a significant competitive advantage over traditional disposal wells for many reasons, primarily:

| | |
|---|---|
| Mobile Facility | able to relocate with minimal capital re-investment |
| Unlimited Capacity | water processed and re-used or evaporated above ground |
| Lower Cap Ex | unlimited capacity and mobility allow for greater longevity |
| New Revenue | recaptured hydrocarbons and water previously disposed of |
| Environmental Regulations | ahead of the curve for environmental legislation |
| Lower Operating Expense | low energy usage and no chemicals used |
| Marketability | "Green Technology" provides a great marketing advantage |
| Government Regulations | environmentally friendly approach reduces typical liability |

6 | Page

Plaintiffs' Exs 12

## Competitive Advantage

The traditional model has chosen to take the "dirty water" and skim a portion of the oil while disposing of the toxic waste into the earth, creating devastating repercussions on the environment for future generations to deal with. SWS has strategically positioned itself to be at the forefront of replacing inefficient, wasteful methods the industry has used for a long time. Our technology takes the same "dirty water", removes nearly 100% of the oil, and cleans the water to a state of low salinity that can be sold or re-used in future fracking operations. In effect, we're able to achieve an 80-85% reduction in usage of the local water supply.

While many other water treatment technologies are capable of processing wastewater in one form or another, the SWS system has a competitive advantage due to our ability to handle a broader spectrum of fluid types with lower associated costs. Many are capable in one degree or another, but fail to achieve the SWS goal of Water Synergy, where all three drivers are achieved:

- Cost-effective Operations
- New Revenue Generation
- Eco-friendly Platform

## Supplement to Traditional SWDs

While SWS is committed to achieve the highest levels of environmentally friendly practices, we realize that there is still great value in improving existing methods of wastewater disposal via injection wells. Our technology eliminates 99% of the bacteria, which has a major impact on the longevity and efficiency of injection wells, primarily through bacteria elimination and a reduction in pressure. The net effect is an increase in the capacity of an injection well, which will reduce the need for drilling a new well or costly re-works of an existing well. Additionally, the inherent safety issues that accompany high-pressure processes are safeguarded against.

## Impact of Declining SWD Capacity



SWD

Volume

*Decline in Volume held constant*

An SWD will decline in volume capacity over time
Scaling and Increased Pressure are primary causes
Operator drills a new SWD to handle water capacity
Diminished Volume Capacity + Migration of Activity
= More SWDs

*Decline in Volume w/ Scaling & Increasing Pressure*

Time in Operation

7 | Page

Plaintiffs' Exs 13

# OPPORTUNITY SUMMARY

Salt Water Disposal Well Rehabilitation -- Portfolio Acquisition



**Strategic Water Solutions, LLC** has invested over five years in the research, development and construction of equipment and systems for wastewater processing in the oil & gas industry. The initial company focus was to build traditional salt water disposal wells (SWD), with an early stage pivot into a model that builds new above-ground recycling facilities and rehabilitates old operational SWDs into recycling facilities.  The shift in focus was primarily due to the fact that as we became more educated in the process, we did not like disposing of fluids in the traditional manner of downhole injection. From a business perspective, we anticipated that in time the general public would feel the same and oppose the current business practice of salt water disposal wells. Recent legislation in Oklahoma and a public outcry of property owners has increased operational costs and liability concerns for major operators in the state, both indicators of increased resistance to current industry practices.

Our guiding philosophy in developing solutions for water treatment:

- Cost-effective Operations
- New Revenue Generation
- Eco-friendly Platform

The SWS business model aims to achieve all three value drivers.

NOT FOR DISTRIBUTION - INFORMATION PROTECTED BY CONFIDENTIALITY AGREEMENT          Page 1

Plaintiffs' Exs 14

## The Opportunity

The timing is ideal to be established as an innovator to a crucial component of the industry that is ill-prepared to operate in a cost-effective and eco-friendly manner. Through the addition of water treatment technology, SWS operates a more effective economic model:

- Recapture a greater percentage of Hydrocarbons
- Reduce Transportation costs for operators
- Recycle the Water to be sold for re-use in the fracking process
- Reputation as Industry Leader in Eco-friendly practices

We are currently reviewing multiple portfolios of over 30 assets held by large operators that are seeking to liquidate profitable assets in order to rebuild their balance sheet. Characteristics of the assets include:

- Currently in operation
- Originally built for $2.5 million – $5 million
- Within proximity to our network of Operators / Trucking Companies = Immediate Contracts for water
- Acquisition costs typically ranging from 15% - 25% of original construction cost
- Current operators that will stay = Seamless Transition

*(See Attachment for a select list of some of the assets under review.)*

## Target Portfolio Acquisition

SWS seeks to source and work with a capital partner in the acquisition of approximately **$15 to $30M** in assets to create a high valued portfolio in the next 2-12 months. SWS will make a substantial impact on the overall disposal well business with superior technology to add efficiencies not seen in the industry to date. This portfolio shall consist of assets that represent Current Value (existing cash flow), Short-Term Value (pending contracts for more water) and Long-Term Value (ability to add new revenue streams). Additionally, purchasing undervalued assets, making reasonable capital improvements to the existing structure and adding equipment with water treatment technology will make a substantial impact to the balance sheet. For an average budget of $800K to $6M per site, SWS will rehabilitate existing SWDs and convert them into eco-friendly water recycling facilities generating projected gross revenue of $4 - $8M.

SWS will quickly become the dominant force for disposal within Texas. This portfolio, along with the **$100,000,000** of disposal infrastructure SWS is currently developing in West Texas will be a dominant force to contend with for years to come. On average, SWS is installing a new disposal plant every 45 days with the most advanced technology seen in the industry to clean the fluid for evaporation or reuse and all above ground.



*Recently completed above ground water recycling facility*

NOT FOR DISTRIBUTION - INFORMATION PROTECTED BY CONFIDENTIALITY AGREEMENT

Plaintiffs' Exs 15

## Asset 1 – Andrews, TX – High Priority Asset to Acquire

This targeted asset is located 5 miles SE from Andrews, Texas (Permian Basin).
Characteristics of this site include:

- ° Site was acquired and recompleted in 2013 ($1.75M improvement)
- ° Permitted for 20,000 bwpd
- ° Originally built for a cost of $3.5+ million
- ° In good condition
- ° Currently processing approximately 2,000 bpd
- ° 30 days:  commitments for additional 3,000 bpd of water after purchase  (total volume = 5,000 bpd)
- ° 6 months:  commitments for additional 5,000 bpd of water after purchase (total volume = 10,000 bpd)
- ° As the price of oil recovers and activity resumes, the volume of water is expected to reach 15,000 bpd.


**Use of Funds – Phase 1**          $950,000          Initial Investment (includes 4 months Operating Capital)
                                                      20% Investor Equity in Site
                                                      80% Investor Pref until Payout of $950,000


**Use of Funds – Phase 2 & 3**       $800,000          Paid for out of Cash Flow in Year 2



Plaintiffs' Exs 16

Milestones

| | | | |
|---|---|---|---|
| Site Acquisition | Month 1 | 2,000 bbl / day | |
| New Water Contracts | Month 2 | 3,000 bbl / day | (Total:  5,000 bbl / day) |
| New Technology Equipment* | Month 7 | 5,000 bbl / day | (Total:  10,000 bbl / day) |
| | Month 12 | 5,000 bbl / day | (Total:  12,500 bbl / day) |
| Return of Investor Equity | Month 11 | | |
| Reduce/Eliminate Fluid Injection** | Month 18 | | |
| Potential Exit*** | Month 24+ | 15,000 bbl / day | Target Daily Volume |

*Addition of Water Recycling Equipment will increase the capacity of daily volume (not limited by capacity of an injection well), increase the percentage of hydrocarbon recovery and allow for the possibility to sell water.

**Use of Green Technology and reduction/elimination of injecting fluids downhole will add value to site.

***Potential Exit will be ideal when facility is operating at a high daily volume (12,500+ bpd) and the price of oil has recovered to $60+.

Operational Plan

Phase 1 -    maximize daily volume of injection well capacity (5,000 bpd)
a commitment from local trucking company will allow this to happen in 30 days

Phase 2 -    add water recycling equipment, initiate permit process, construct evaporation pits
install water recycling equipment in Month 18
continue to increase daily volume of water received with same trucking company (15,000 bpd)
hybrid approach of evaporating and selling recycled water, plus continuing to inject some water

Phase 3 -    maximize water contracts for both disposal and re-sale (15,000 bpd received / 7,500 bpd sold)
major reduction or elimination of need for any downhole injection
maximize perceived value of site from both economic and "eco-friendly" viability

Plaintiffs' Exs 17

## Project / Development Team

Strategic Water Solutions          Ownership / Project Management

The principals of Strategic Water Solutions have an extensive background in start-ups and building fast growing businesses, with specialized experience in construction management, real estate development, finance and general consulting. With a particular focus over the last 5 years on water treatment technologies, SWS has incorporated advanced technology into a more effective business model for the oil and gas industry that yields greater profits.

Advanced Construction          Site Operations

The Site will be maintained and operated by Advanced Construction, an industry leader in oil and gas field construction and maintenance services. Advanced has been in oilfield support business since 1999, with vast experience in building, maintenance and operations of turn-key saltwater disposal facilities throughout Texas, Oklahoma, New Mexico and North Dakota. To date, Advanced has built over 75 SWDs.

Larry Kirkland          Operations Consultant

Larry Kirkland is 40+ year oil and gas production industry veteran who has extensive experience with operations, commissioning, design and construction management experience with SWDs, water transfer systems and water treating technology. Larry progressed from hands-on work in construction and plant operations to management and senior management of both domestic and foreign capital projects. Larry currently serves as a Water Group Leader for EOG Resources, Inc. (NYSE: EOG), one of the largest independent (non-integrated) crude oil and natural gas companies in the United States with proved reserves in the United States, Canada, Trinidad, the United Kingdom and China. Prior to joining EOG Resources, Larry gained extensive experience in senior management roles for many of the industry's top companies, including Kellogg-Brown and Root and Exxon Company USA.

James Welch          Regulations / Water Consultant

James Welch is a 29-year oil and gas veteran, with a particular expertise in water management solutions and industry regulations. A career that includes working with Halliburton, Select Energy Services, Baker Hughes and Siemens, James has an established reputation as a speaker, author, and proficient technical background with a focus on business development. He helped support the Texas Water Recycle Association in drafting language to amend the Texas Administrative Code adopting produced water recycle standards for the state. His field experience has been utilized by many companies to evaluate new technologies and create go-to-market strategies to commercialize them. James will play a major role in helping to establish the brand value of our SWD rehabilitation process within the industry.

NOT FOR DISTRIBUTION - INFORMATION PROTECTED BY CONFIDENTIALITY AGREEMENT          Page 5

Plaintiffs' Exs 18

Financial Pro Forma (Summary)

### Year 1

| | | | |
|---|---|---|---|
| Disposal Fee | | $ | 0.50 |
| Oil Recapture: | Phase 1 | | 1.25% |
| | | | |
| Oil Resale: | Phase 1 | $ | 40 |
| Oil Resale: | Phase 2 | $ | 45 |
| Water Recapture & Sold | | | 0% |
| Water Resale | | $ | 0.30 |

| | | |
|---|---|---|
| Revenue | $ | 3,276,445 |
| Operating Expenses | $ | 1,791,672 |
| Capital Expenses | $ | - |
| EBITDA | $ | 1,484,773 |
| | | |
| Investor 80% pre-payout | $ | 1,005,200 |
| SWS 20% | $ | 479,573 |

### Year 2

| | | | |
|---|---|---|---|
| Disposal Fee | | $ | 0.55 |
| Oil Recapture: | Phase 1 | | 1.25% |
| Oil Recapture: | Phase 2 | | 1.50% |
| Oil Resale: | Phase 2 | $ | 45 |
| Oil Resale: | Phase 3 | $ | 50 |
| Water Recapture & Sold | | | 35% |
| Water Resale | | $ | 0.40 |

| | | |
|---|---|---|
| Revenue | $ | 6,581,406 |
| Operating Expenses | $ | 2,856,691 |
| Capital Expenses | $ | 800,000 |
| EBITDA | $ | 2,924,715 |
| | | |
| Investor 20% post-payout | $ | 584,943 |
| SWS 80% | $ | 2,339,772 |

### Year 3

| | | | |
|---|---|---|---|
| Disposal Fee | | $ | 0.60 |
| Oil Recapture: | Phase 2 | | 1.50% |
| | | | |
| Oil Resale: | Phase 3 | $ | 50 |
| Oil Resale: | Phase 4 | $ | 55 |
| Water Recapture & Sold | | | 50% |
| Water Resale | | $ | 0.45 |

| | | |
|---|---|---|
| Revenue | $ | 8,828,438 |
| Operating Expenses | $ | 3,334,935 |
| Capital Expenses | $ | 400,000 |
| EBITDA | $ | 5,093,503 |
| | | |
| Investor 20% | $ | 1,018,701 |
| SWS 80% | $ | 4,074,802 |

Assumptions

Oil Recapture: 2 Phases of increased oil recovery.
- Phase 1: 1.25% skim w/o technology
- Phase 2: 1.5% skim w/ technology

Oil Resale: 4 Phases of rise in oil prices (price reflects a $5 per barrel broker fee).
- Phase 1: $40 / bbl   Year 1
- Phase 2: $45 / bbl   Years 1 & 2
- Phase 3: $50 / bbl   Years 2 & 3
- Phase 4: $55 / bbl   Years 3+

Landowner Royalty: 10%

Plaintiffs' Exs 19

Investor Summary - Example

| | | | |
|---|---|---|---|
| Year 1 | | $ | 1,050,000 |
| Year 2 | | $ | 584,943 |
| Year 3 | | $ | 1,018,701 |
| | | | |
| Capital Investment | | $ | 950,000 |
| Return of Equity | | | 11 months |
| ROI | 3-year Total | | 179% |
| ROI | 3-year Avg. | | 60% |
| Annual Return | Years 4+ | | 107% |

Participation Prior to Return of Equity          80%

Participation After Return of Equity             20%

Exit Scenarios          Sell Site in 2+ years (max-out site and capitalize on market recovery).

Hold Site for projected annual return of 107% (of initial investment).

NOT FOR DISTRIBUTION - INFORMATION PROTECTED BY CONFIDENTIALITY AGREEMENT          Page 7

Plaintiffs' Exs 20

# Annual Pro Forma - Water Recycling Facility

| | | |
|---|---|---|
| Disposal Fee | $ 0.50 | |
| Oil Recapture 1 | 1.25% | without Technology |
| Oil Resale 1 | $ 40 | Months 1 - 6 |
| Oil Resale 2 | $ 45 | Months 7 - 12 |
| Water Recapture & Sold | 0% | |
| Water Resale | $ 0.30 | |

| | | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Volume of Water Processed** | | bbl/day | 2,000 | 3,000 | 6,000 | 7,000 | 7,500 | 8,500 | 10,000 | 10,500 | 11,000 | 11,500 | 12,000 | 12,500 | 365 |
| | | days | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 365 |
| | | Total bbl | 60,833 | 152,083 | 182,500 | 212,917 | 228,125 | 258,542 | 304,167 | 319,375 | 334,583 | 349,792 | 365,000 | 380,208 | 3,346,125 |
| | | | | | | | | | | | | | | | |
| **Total revenue** | | | | | | | | | | | | | | | |
| Disposal Fees | $0.50 | | 30,417 | 76,042 | 91,250 | 106,458 | 114,063 | 129,271 | 152,083 | 159,688 | 167,292 | 174,895 | 182,500 | 190,104 | 1,574,063 |
| Oil Revenue | $40-$45 | | 30,417 | 76,042 | 91,250 | 106,458 | 114,063 | 129,271 | 171,094 | 179,698 | 188,203 | 196,758 | 205,313 | 213,867 | 1,702,383 |
| Water Resale | $0.30 | | | | | | | | | | | | | | |
| Total $ | | | $ 60,833 | $ 152,083 | $ 182,500 | $ 212,917 | $ 228,125 | $ 258,542 | $ 323,177 | $ 339,336 | $ 355,495 | $ 371,654 | $ 387,813 | $ 403,971 | $ 3,276,445 |
| | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | |
| Landowner Royalty | 10.0% | | 6,083 | 15,208 | 18,250 | 21,292 | 22,813 | 25,854 | 32,318 | 33,934 | 35,549 | 37,165 | 38,781 | 40,397 | 327,645 |
| Mortgage Payment | 10.0% | | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 163,176 |
| Management Fee | daily volume | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,500 | 11,000 | 11,500 | 12,000 | 12,500 | 127,500 |
| Sales Commission | 0.10 | | 6,083 | 15,208 | 18,250 | 21,292 | 22,813 | 25,854 | 30,417 | 31,938 | 33,458 | 34,979 | 36,500 | 38,021 | 314,813 |
| Power | 5.0% | | 3,042 | 7,604 | 9,125 | 10,646 | 11,406 | 12,927 | 15,208 | 15,969 | 16,729 | 17,490 | 18,250 | 19,010 | 157,406 |
| Labor | 300 | | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 9,125 | 109,500 |
| Maintenance | 8.0% | | 4,867 | 12,167 | 14,600 | 17,033 | 18,250 | 20,683 | 24,333 | 25,550 | 26,767 | 27,983 | 29,200 | 30,417 | 251,850 |
| Chemicals | 4.0% | | 2,433 | 6,083 | 7,300 | 7,300 | 7,300 | 7,300 | 7,300 | 7,300 | 7,300 | 7,300 | 7,300 | 7,300 | 81,517 |
| Solids Disposal | 3.0% | | 1,825 | 4,563 | 5,475 | 6,388 | 6,844 | 7,756 | 9,125 | 9,581 | 10,038 | 10,494 | 10,950 | 11,406 | 94,444 |
| Admin / Legal | 2.5% | | 1,521 | 3,802 | 4,563 | 5,323 | 5,703 | 6,464 | 8,079 | 8,483 | 8,827 | 9,291 | 9,695 | 10,099 | 81,911 |
| Insurance | 1.5% | | 913 | 2,281 | 2,738 | 3,194 | 3,422 | 3,878 | 4,848 | 5,090 | 5,332 | 5,575 | 5,817 | 6,060 | 49,167 |
| Misc | 1.0% | | 608 | 1,521 | 1,825 | 2,129 | 2,281 | 2,585 | 3,232 | 3,393 | 3,555 | 3,717 | 3,878 | 4,040 | 32,764 |
| Total OpEx | | | $ 60,098 | $ 101,161 | $ 114,848 | $ 127,319 | $ 133,564 | $ 146,025 | $ 167,563 | $ 174,461 | $ 181,339 | $ 188,217 | $ 195,095 | $ 201,975 | $ 1,791,672 |
| | | | | | | | | | | | | | | | |
| **Net Operating Cash** | | | $ 735 | $ 50,923 | $ 67,652 | $ 85,598 | $ 94,571 | $ 112,517 | $ 155,594 | $ 164,875 | $ 174,156 | $ 183,437 | $ 192,718 | $ 201,998 | $ 1,484,773 |
| Capital Expense | | | $ 735 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| EBITDA | | | $ 735 | $ 50,923 | $ 67,652 | $ 85,598 | $ 94,571 | $ 112,517 | $ 155,594 | $ 164,875 | $ 174,156 | $ 183,437 | $ 192,718 | $ 201,998 | $ 1,484,773 |

Assumptions:

| | |
|---|---|
| Volume of Water Processed | will grow from 2,000 bbl/day (current volume) to 10,000 bbl/day in 6 months with verbal commitments from trucking companies |
| Disposal Fee | current market rate in area is .50 / bbl |
| Oil Recapture (1) & Resale | will increase on an annual basis as the price of oil recovers. |
| | will increase as price of oil recovers and new technology is added. |
| Labor | $300 per day (1.5 men, expect efficiencies with sites in close proximity to each other to reduce labor costs) |

## Annual Pro Forma - Water Recycling Facility

| | | |
|---|---|---|
| Disposal Fee | $ | 0.55 |
| Oil Recapture 1 | 1.25% | without Technology |
| Oil Recapture 2 | 1.50% | with Technology |
| Oil Resale 2 | $ | 45  Months 13 - 18 |
| Oil Resale 3 | $ | 50  Months 19 - 24 |
| Water Recapture & Sold | | 35% |
| Water Resale | $ | 0.40 |

| | | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Volume of Water Processed** | | | | | | | | | | | | | | |
| | bbl/day | 12,500 | 12,500 | 12,500 | 13,500 | 13,500 | 13,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | |
| | days | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 365 |
| | Total bbl | 380,208 | 380,208 | 380,208 | 410,625 | 410,625 | 410,625 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 5,410,000 |
| **Total Revenue** | | | | | | | | | | | | | | |
| Disposal Fees | 50.53 | 209,115 | 209,115 | 209,115 | 225,844 | 225,844 | 225,844 | 250,938 | 250,938 | 250,938 | 250,938 | 250,938 | 250,938 | 2,810,500 |
| Oil Revenues | $45 - $50 | 213,867 | 213,867 | 213,867 | 230,977 | 230,977 | 230,977 | 342,188 | 342,188 | 342,188 | 342,188 | 342,188 | 342,188 | 3,387,656 |
| Water Resale | 30.40 | | | | | | | 63,875 | 63,875 | 63,875 | 63,875 | 63,875 | 63,875 | 383,250 |
| | Total $ | 422,982 | 422,982 | 422,982 | 456,820 | 456,820 | 456,820 | 657,000 | 657,000 | 657,000 | 657,000 | 657,000 | 657,000 | 6,581,406 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Land/Owner Royalty | 10.0% | 42,298 | 42,298 | 42,298 | 45,682 | 45,682 | 45,682 | 65,700 | 65,700 | 65,700 | 65,700 | 65,700 | 65,700 | 688,141 |
| Mortgage Payment | 10.0% | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 163,176 |
| Management Fee | daily volume | 12,500 | 12,500 | 12,500 | 13,500 | 13,500 | 13,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 168,000 |
| Sales Commission | 0.10 | 38,021 | 38,021 | 38,021 | 41,063 | 41,063 | 41,063 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 511,000 |
| Power | 5.0% | 19,010 | 19,010 | 19,010 | 20,531 | 20,531 | 20,531 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 255,500 |
| Labor | 350 | 10,646 | 10,646 | 10,646 | 10,646 | 10,646 | 10,646 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 155,135 |
| Maintenance | 7.0% | 26,615 | 26,615 | 26,615 | 28,744 | 28,744 | 28,744 | 31,938 | 31,938 | 31,938 | 31,938 | 31,938 | 31,938 | 357,700 |
| Chemicals | 4.0% | 15,208 | 15,208 | 15,208 | 16,425 | 16,425 | 16,425 | 18,250 | 18,250 | 18,250 | 18,250 | 18,250 | 18,250 | 204,400 |
| Solids Disposal | 3.0% | 11,406 | 11,406 | 11,406 | 12,319 | 12,319 | 12,319 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 153,300 |
| Admin / Legal | 1.5% | 6,345 | 6,345 | 6,345 | 6,852 | 6,852 | 6,852 | 9,855 | 9,855 | 9,855 | 9,855 | 9,855 | 9,855 | 98,771 |
| Insurance | 1.0% | 4,230 | 4,230 | 4,230 | 4,568 | 4,568 | 4,568 | 6,570 | 6,570 | 6,570 | 6,570 | 6,570 | 6,570 | 65,814 |
| Misc | 1.0% | 4,230 | 4,230 | 4,230 | 4,568 | 4,568 | 4,568 | 6,570 | 6,570 | 6,570 | 6,570 | 6,570 | 6,570 | 65,814 |
| | Total Optx | 204,107 | 204,107 | 204,107 | 218,496 | 218,496 | 218,496 | 264,814 | 264,814 | 264,814 | 264,814 | 264,814 | 264,814 | 2,855,691 |
| **Operating Profit** | | | | | | | | | | | | | | |
| Net Cash | | $ 218,875 | $ 218,875 | $ 218,875 | $ 238,324 | $ 238,324 | $ 238,324 | $ 392,186 | $ 392,186 | $ 392,186 | $ 392,186 | $ 392,186 | $ 392,186 | $ 3,724,715 |
| Capital Expense | | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 800,000 |
| EBITDA | | $ 18,875 | $ 18,875 | $ 18,875 | $ 38,324 | $ 238,324 | $ 238,324 | $ 392,186 | $ 392,186 | $ 392,186 | $ 392,186 | $ 392,186 | $ 392,186 | $ 2,924,715 |

**Assumptions:**

| | |
|---|---|
| Volume of Water Processed | will grow from 15,000 bbl/day to 17,500 bbl/day. |
| Disposal Fee | current market rate in area is .50 / bbl; will increase on an annual basis as the price of oil recovers. |
| Oil Recapture (t) & Resale | will increase as price of oil recovers and new technology is added. |
| Labor | $450 per day, multiple sites in close proximity allows for labor efficiency |

Annual Pro Forma - Water Recycling Facility

| Disposal Fee | $ 0.60 |
|---|---|
| Oil Recapture 3 | 1.50% with Technology |
| Oil Resale 3 | $5 |
| Oil Resale 4 | $5 |
| Water Recapture & Sold | 50% |
| Water Resale* | $ 0.45 |

| | | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Volume of Water Processed** | bbl/day | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | |
| | days | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 365 |
| | Total bbl | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 456,250 | 5,475,000 |
| **Total Revenue** | Total $ | | | | | | | | | | | | | |
| Disposal Fees | $0.60 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 273,750 | 3,285,000 |
| Oil Revenues | $50-$55 | 342,188 | 342,188 | 342,188 | 342,188 | 342,188 | 342,188 | 376,406 | 376,406 | 376,406 | 376,406 | 376,406 | 376,406 | 4,311,563 |
| Water Resale | $0.45 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 102,656 | 1,231,875 |
| | **Total $** | **718,594** | **718,594** | **718,594** | **718,594** | **718,594** | **718,594** | **752,813** | **752,813** | **752,813** | **752,813** | **752,813** | **752,813** | **8,828,438** |
| **Operating Expenses** | daily volume | | | | | | | | | | | | | |
| Landowner Royalty | 10.0% | 71,859 | 71,859 | 71,859 | 71,859 | 71,859 | 71,859 | 75,281 | 75,281 | 75,281 | 75,281 | 75,281 | 75,281 | 882,344 |
| Mortgage Payment | 10.0% | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 13,598 | 163,176 |
| Management Fee | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| Sales Commission | 0.10 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 45,625 | 547,500 |
| Power | 5.0% | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 22,813 | 273,750 |
| Labor | 500 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 15,208 | 282,500 |
| Maintenance | 7.0% | 50,302 | 50,302 | 50,302 | 50,302 | 50,302 | 50,302 | 52,697 | 52,697 | 52,697 | 52,697 | 52,697 | 52,697 | 617,991 |
| Chemicals | 4.0% | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Solids Disposal | 3.0% | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 13,688 | 164,250 |
| Admin / Legal | 1.25% | 8,982 | 8,982 | 8,982 | 8,982 | 8,982 | 8,982 | 9,410 | 9,410 | 9,410 | 9,410 | 9,410 | 9,410 | 110,355 |
| Insurance | 1.0% | 7,528 | 7,528 | 7,528 | 7,528 | 7,528 | 7,186 | 7,528 | 7,528 | 7,528 | 7,528 | 7,528 | 7,528 | 18,284 |
| Misc | 1.0% | 7,186 | 7,186 | 7,186 | 7,186 | 7,186 | 7,186 | 7,528 | 7,528 | 7,528 | 7,528 | 7,528 | 7,528 | 88,291 |
| | **Total OpEx** | **274,447** | **274,447** | **274,447** | **274,447** | **274,447** | **274,447** | **281,376** | **281,376** | **281,376** | **281,376** | **281,376** | **281,376** | **3,334,935** |
| **Operating Profit** | | | | | | | | | | | | | | |
| Net Cash | | $ 444,147 | $ 444,147 | $ 444,147 | $ 444,147 | $ 444,147 | $ 444,347 | $ 471,437 | $ 471,437 | $ 471,437 | $ 471,437 | $ 471,437 | $ 471,437 | $ 5,493,503 |
| Capital Expense | | $ 400,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 400,000 |
| EBITDA | | $ 44,147 | $ 444,147 | $ 444,147 | $ 444,147 | $ 444,147 | $ 444,347 | $ 471,437 | $ 471,437 | $ 471,437 | $ 471,437 | $ 471,437 | $ 471,437 | **$ 5,093,503** |

**Assumptions:**

| | |
|---|---|
| Volume of Water Processed | will increase to 20,000 bbl/day. Technology allows for unlimited capacity. |
| Disposal Fee | current market rate in area is .50 / bbl<br>will increase on an annual basis as the price of oil recovers. |
| Oil Recapture (2) & Resale | will increase as price of oil recovers and new technology is added. |
| Water Recapture & Resale | expect to recapture 85% of water processed.<br>projections show 50% of water processed as being resold. |
| Labor | $500 per day |

8/30/2017        Gmail - Fw: MONIES NEEDED FOR ANDREWS COUNTY CLOSING.

Case 3:17-cv-02401-M   Document 17-1   Filed 10/24/17   Page 24 of 103   PageID 457

 Gmail

Avesandsky Davis <friscomojo13aaa@gmail.com>

## Fw: MONIES NEEDED FOR ANDREWS COUNTY CLOSING.
3 messages

**Skeet Sherman** <ssherman@gpande.com>             Tue, Dec 6, 2016 at 6:50 PM
To: "friscomojo13aaa@gmail.com" <friscomojo13aaa@gmail.com>

FYI

**From:** Skeet Sherman
**Sent:** Saturday, July 2, 2016 8:04 AM
**To:** Jon Koster
**Subject:** MONIES NEEDED FOR ANDREWS COUNTY CLOSING.

1,000,000   PURCHASE PRICE

300,000 DOWN PAYMENT

50,000 NON REFUNDABLE DEPOSIT SENT TO OWL ON 6/30/2016

250,000 NEEDED FOR CLOSING ON OR BEFORE 8/31/2016

SECURE SWD PORTION OF CLOSING MONIES

125,000 1/2 DOWN PAYMENT

50,000   1/2 OF 1ST MONTH OP-X EXPENSES + CONSTRUCTION COSTS OF ADDING 2 MORE TRUCK BAYS

100,00 REPAY CURTIS/MARK LOAN

TOTAL NEEDED FOR CLOSING 275,000 $$$

Plaintiffs' Exs 24

8/30/2017                    Gmail - Fw: MONIES NEEDED FOR ANDREWS COUNTY CLOSING.

Case 3:17-cv-02401-M   Document 17-1   Filed 10/24/17   Page 25 of 103   PageID 458

**John Davis** <friscomojo13aaa@gmail.com>
To: Skeet Sherman <ssherman@gpande.com>                    Tue, Dec 6, 2016 at 9:32 PM

So if the 100k was a loan. How did they end up with 50%. There is no record of them funding anything in Jenkins at all.

[Quoted text hidden]

**John Davis** <friscomojo13aaa@gmail.com>
To: David West <David@strategicwatersolution.com>           Thu, Dec 8, 2016 at 1:00 PM

Begin forwarded message:

**From:** Skeet Sherman <ssherman@gpande.com>
**Date:** December 6, 2016 at 6:50:34 PM CST
**To:** "friscomojo13aaa@gmail.com" <friscomojo13aaa@gmail.com>
**Subject: Fw: MONIES NEEDED FOR ANDREWS COUNTY CLOSING.**

[Quoted text hidden]

Plaintiffs' Exs 25

# PURCHASE AND SALE AGREEMENT

# Jenkins #1 Lease, Andrews County, Texas

This Purchase and Sale Agreement (this "Agreement") is dated effective as of August 31, 2016 (the "Effective Date"), and is between OWL Jenkins SWD, LLC (hereinafter referred to as "Owner") and Jenkins No. 1, LLC (hereinafter referred to as "Buyer").

In consideration of the mutual promises contained herein, the mutual benefits to be derived by each party hereunder and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Buyer and Owner agree as follows:

1. **Agreement to Sell and Purchase.** Subject to the terms and provisions of this Agreement, the Owner agrees to sell and assign, and Buyer agrees to purchase, all of Owner's right, title, and interests in, to and under the following:

   a.   The salt water disposal lease described in Exhibit A hereto, and any ratifications and/or amendments to such lease, whether or not such ratifications or amendments are described in Exhibit A insofar, and only insofar, as they cover the lands described on Exhibit A (the "Leases");

   b.   The salt water disposal wells located on the Leases identified in Exhibit A hereto and all property and equipment located thereon and used in connection therewith, including, but not limited to pumps, platforms, well equipment (surface and subsurface), water wells, lines and facilities on the Leases (the "Equipment");

   c.   To the extent transferable, all contracts and contractual rights insofar as they relate to the Leases and Equipment including, but not limited to, servitudes, easements, rights-of-way, permits, surface leases and rights, subleases and assignments, operating agreements, licenses, orders and similar rights leased or owned by Owner (the "Contracts"); and

   d.   The fee surface estate covering approximately 3.12 acres as described in Exhibit B hereto (the "Surface").

The Leases, Equipment, Contracts and Surface are sometimes hereafter collectively referred to as the "Assets".

2. **Excluded Assets.** Owner expressly EXCEPTS and RESERVES from the Assets:

   a.   Owner's right, title, and interests in the Assets to the extent such are attributable to any time prior to the Effective Date;

   b.   All rights and claims of any nature relating to the Assets which Owner has asserted or is entitled to assert and which relate in to any time period prior to the Effective Date; and

   c.   Except as otherwise specifically herein provided, all monies, proceeds, benefits, receipts, credits, income or revenues relating to the Assets and attributable to periods prior to the Effective Date.

Plaintiffs' Exs 26

The Excluded Assets will remain the property of Owner after the closing.

3.      **Purchase Price.** In consideration of the sale, assignment and transfer of the Assets, Buyer will pay to Owner the amount of One Million Dollars ($1,000,000.00) (the "Purchase Price"), adjusted in accordance with this Agreement and payable to Owner as set forth in Section 6(b) below.  Buyer has paid Owner a deposit in the amount of Fifty Thousand Dollars ($50,000.00) (the "Deposit").

4.      **Representations and Inspection:**

A. Owner Disclaimer: EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE PURCHASE AND SALE CONTEMPLATED BY THIS AGREEMENT IS ON AN "AS IS" BASIS, AND OWNER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OF TITLE QUANTITY, QUALITY, CONDITION, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, OR SAFETY OF EQUIPMENT

B. Owner Representations: Owner represents and warrants to Buyer:

(i)      There is no pending litigation affecting the Leases and Equipment, nor, to Owner's Knowledge, are there any unresolved claims for which Owner has received written notice regarding salt water contamination of the fresh water aquifer underlying the Leases. As used herein, the term "Owner's Knowledge" means the actual knowledge, without any duty of inquiry, of either Chris Cooper or Nevin Bannister.

(ii)      Owner has the authority to execute this Agreement and the Assignment and Bill of Sale provided for herein.

(iii)      Owner has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Buyer shall have any responsibility.

C. Buyer's Representations: Buyer represents and warrants to Owner that:

(i)      Buyer has the authority to execute this Agreement and the Assignment and Bill of Sale provided for herein.

(ii)      Buyer has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Owner shall have any responsibility.

D. Inspection Rights: Subject to the provisions hereinafter provided, Buyer specifically assumes the risk of description, and the condition of the Assets and has inspected the Leases and the Equipment prior to the date hereof.  Such inspection shall cover, but not be limited to, the physical and environmental condition, both surface and subsurface, of the Leases and Equipment.  NO WARRANTY OF ANY KIND IS MADE BY OWNER AS TO ANY INFORMATION PROVIDED TO BUYER IN CONNECTION WITH ITS INSPECTION OF THE ASSETS and Buyer agrees that any conclusions made therefrom shall be the result of its own independent review and judgment.

5.      **Closing.** Concurrently with the execution of this Agreement:

521060 000078 18291395.4

a.  Owner shall deliver to Buyer a duly executed recordable Assignment and Bill of Sale in the form attached as Exhibit C hereto pursuant to which Owner will convey the Assets to Buyer effective as of the Effective Date.

b.  Buyer shall pay to Owner the Purchase Price as follows:

- $250,000 in good and immediately available funds by wire transfer;
- Owner's retention of the Deposit; and
- Buyer's execution and delivery of (i) a promissory note in the stated principal amount of $700,000, bearing interest at the per annum rate of 10%, with principal and interest payable quarterly, which note shall be in the form attached as Exhibit D hereto, and (ii) a mortgage in the form attached as Exhibit E hereto.

c.  Owner will execute and deliver Texas Railroad Commission forms P-4, Change of Operator, designating Buyer as Operator of the Lease.

d.  Owner will deliver a release of any liens held by Texas Capital Bank on the Assets.

Within five (5) days after the Effective Date, Owner will deliver to Buyer all available copies of information and/or data (including, but not limited to, leases, title opinions, division orders, logs, Railroad Commission permits, geologic data, well files, and maintenance records, etc.) concerning the Assets which Owner possesses; excluding, however, (i) all of Owner's financial records that relate to Owner's business generally, and (ii) all documents and instruments of Owner that may be protected by an attorney-client privilege or any attorney work product doctrine.

6.  **Liabilities and Indemnities After Closing.**

Buyer shall observe and comply with all covenants, terms, and provisions, express or implied, contained in the agreements, Leases, easements, and all other Contracts and the purchase and sale contemplated by this Agreement is made expressly subject to all such agreements, Leases, easements, and other Contracts, whether or not the same are herein specifically identified.

A.  Buyer's Indemnities. BUYER ACKNOWLEDGES THAT (i) IT HAS BEEN AFFORDED AN OPPORTUNITY TO (a) EXAMINE THE ASSETS AND SUCH MATERIALS AS IT HAS REQUESTED TO BE PROVIDED TO IT BY OWNER; (b) DISCUSS WITH REPRESENTATIVES OF OWNER SUCH MATERIALS AND THE NATURE AND OPERATION OF THE ASSETS; AND (c) INVESTIGATE THE CONDITION, INCLUDING SUBSURFACE CONDITION OF THE REAL PROPERTY AND THE CONDITION OF THE EQUIPMENT; (ii) IT HAS ENTERED INTO THIS AGREEMENT ON THE BASIS OF ITS OWN INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSETS INCLUDING SUBSURFACE CONDITION; (iii) THE ASSETS HAVE BEEN USED IN THE MANNER AND FOR THE PURPOSES SET FORTH ABOVE AND THAT PHYSICAL CHANGES TO THE ASSETS MAY HAVE OCCURRED AS A RESULT OF SUCH USE; (iv) IN ENTERING INTO THIS AGREEMENT, BUYER HAS RELIED SOLELY ON ITS INDEPENDENT INVESTIGATIONS AND JUDGMENTS WITH RESPECT TO THE EQUIPMENT AND THE OTHER ASSETS AND THE ADVICE OF ITS OWN LEGAL, TAX, ECONOMIC, ENVIRONMENTAL ENGINEERING, GEOLOGICAL AND GEOPHYSICAL ADVISORS AND NOT ON ANY COMMENTS OR STATEMENTS OF ANY REPRESENTATIVES OF OR CONSULTANTS OR ADVISORS ENGAGED BY OWNER.  BUYER ASSUMES AND SHALL FULLY SATISFY ALL OF OWNER'S OBLIGATIONS AND RESPONSIBILITIES WITH RESPECT TO, AND INDEMNIFIES OWNER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, MANAGERS, PARTNERS, AND AGENTS FROM ANY AND ALL LIABILITIES, COSTS, EXPENSES

AND CLAIMS OF ANY KIND OR CHARACTER ARISING OUT OF, IN CONNECTION WITH, OR RELATING TO (i) THE OWNERSHIP AND OPERATION OF THE ASSETS, INCLUDING, BUT NOT LIMITED TO THE TERMS AND PROVISIONS OF THE LEASES AND CONTRACTS AFTER THE EFFECTIVE DATE AND (ii) ALL LAWS AND REGULATIONS, INCLUDING, BUT NOT LIMITED TO APPLICABLE ENVIRONMENTAL LAWS, REGARDLESS OF WHETHER SUCH LIABILITIES AROSE BEFORE, ON OR AFTER THE EFFECTIVE DATE.

THE FOREGOING INDEMNIFICATIONS SHALL APPLY WHETHER OR NOT SUCH LIABILITIES ARISE OUT OF (I) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF THE INDEMNIFIED PARTY OR (ii) STRICT LIABILITY.

B. **Owner's Indemnity.** OWNER INDEMNIFIES BUYER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, MANAGERS, PARTNERS, AND AGENTS, FROM ANY AND ALL LIABILITIES (OTHER THAN ENVIRONMENTAL), COSTS, EXPENSES AND CLAIMS OF ANY KIND OR CHARACTER ARISING OUT OF, IN CONNECTION WITH, OR RELATING TO (i) A BREACH OF OWNER'S REPRESENTATIONS or WARRANTIES CONTAINED IN THIS AGREEMENT, (ii) A BREACH OF OWNER'S COVENANTS OR AGREEMENTS UNDER THIS AGREEMENT, or (iii) THE EXCLUDED ASSETS. Owner shall not have any liability for any indemnification hereunder for any individual liability unless the amount with respect to such liability exceeds Fifty Thousand ($50,000.00) ("Indemnity Deductible") and then only to the extent such liability exceeds such Indemnity Deductible. Notwithstanding anything to the contrary contained in this Agreement, Owner shall not be required to indemnify Buyer for aggregate liabilities in excess of the Purchase Price.

THE FOREGOING INDEMNIFICATIONS SHALL APPLY WHETHER OR NOT SUCH LIABILITIES ARISE OUT OF (I) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF THE INDEMNIFIED PARTY OR (ii) STRICT LIABILITY.

7. **Taxes.** Owner shall be responsible for all oil sales taxes and any other severance or similar taxes occurring prior to the Effective Date, and Buyer shall be responsible for all such taxes occurring on and after the Effective Date. Ad valorem taxes and other property taxes assessed attributable to the Assets for the year 2016 shall be borne 8/12th by Owner and 4/12th by Buyer. All fees, costs, charges, and expenses payable to any federal, state or municipal authority, including without limitation, all filing fees, documentary stamps, and transfer, sales and other taxes required to be paid, or imposed in connection with the conveyance of the Assets under the terms of this Agreement shall be paid by Buyer.

8. **Waiver of Texas DTPA.** Buyer hereby waives the provisions of the Texas Deceptive Trade Practices Act, Chapter 17, Subchapter E, Section 17.41 - 17.63 inclusive, Texas Business & Com. Code, except Section 17.55A, which is not waived. IN ORDER TO EVIDENCE ITS ABILITY TO GRANT SUCH WAIVER, BUYER HEREBY REPRESENTS AND WARRANTS TO OWNER THAT BUYER (i) IS IN THE BUSINESS OF SEEKING OR ACQUIRING, BY PURCHASE OR LEASE, GOODS OR SERVICES FOR COMMERCIAL OR BUSINESS USE, (ii) HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THE TRANSACTION CONTEMPLATED HEREBY, AND (iii) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9. **Entire Agreement; Modification.** This Agreement constitutes the entire understanding between Owner and Buyer with regard to the subject matter hereof, superseding all prior statements,

representations, discussions, agreements, and understandings. This Agreement may not be amended or modified except by a written instrument executed by Owner and Buyer.

10.    **Governing Law; Venue.** The performance and interpretation of this Agreement shall be under and pursuant to the laws of the State of Texas.  Any action to enforce the provisions contained in this Agreement may only be brought in the District Court of Dallas County, Texas.

11.    **Survival of Agreement.** It is understood the covenants and agreements of Buyer and Owner herein contained shall survive the closing of the transactions contemplated hereby, the execution of the Assignment and Bill of Sale by Owner, and the delivery of the Assets to Buyer; provided that Owner's covenants and agreements set forth in Section 6B shall survive only for six (6) months after Closing.

12.    **Counterpart Execution.** This Agreement may be executed in any number of counterparts, each of which shall be binding on the parties executing same and shall be considered an original for all purposes.

13.    **Expenses.** Buyer and Owner each agree to pay their own expenses and fees associated with this Agreement and the transactions contemplated hereby.

14.    **Press Releases.** Except as may be required under applicable law, no party shall make any press release with respect to the transaction contemplated hereby without the consent of the other party, such consent not to be unreasonably withheld or delayed.

BUYER - Jenkins No. 1, LLC


By: _____
Name: Scott Sherman
Title: *Manager*


OWNER – OWL JENKINS SWD, LLC

By:  Oilfield Permian, LLC, its sole member


By: _____
Name:
Title:

Plaintiffs' Exs 30

representations, discussions, agreements, and understandings. This Agreement may not be amended or modified except by a written instrument executed by Owner and Buyer.

10.     **Governing Law; Venue.** The performance and interpretation of this Agreement shall be under and pursuant to the laws of the State of Texas.  Any action to enforce the provisions contained in this Agreement may only be brought in the District Court of Dallas County, Texas.

11.     **Survival of Agreement.** It is understood the covenants and agreements of Buyer and Owner herein contained shall survive the closing of the transactions contemplated hereby, the execution of the Assignment and Bill of Sale by Owner, and the delivery of the Assets to Buyer; provided that Owner's covenants and agreements set forth in Section 6B shall survive only for six (6) months after Closing.

12.     **Counterpart Execution.** This Agreement may be executed in any number of counterparts, each of which shall be binding on the parties executing same and shall be considered an original for all purposes.

13.     **Expenses.** Buyer and Owner each agree to pay their own expenses and fees associated with this Agreement and the transactions contemplated hereby.

14.     **Press Releases.** Except as may be required under applicable law, no party shall make any press release with respect to the transaction contemplated hereby without the consent of the other party, such consent not to be unreasonably withheld or delayed.

BUYER - Jenkins No. 1, LLC


By: _____
Name: Scott Sherman
Title:


OWNER – OWL JENKINS SWD, LLC

By: Oilfield Permian, LLC, its sole member

By: _____
Name: Nevin Bannister
Title: COO

521060 000078 18291395.4

Plaintiffs' Exs 31

## ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale (this **"Assignment"**), dated effective as of the 31st day of August 2016 at 9:00 a.m. local time at the respective locations of the Purchased Assets (the **"Effective Time"**), is made and entered into by and between OWL Jenkins SWD, LLC (**"Assignor"**), a Texas limited liability company, whose address is 8214 Westchester Drive, Suite 850, Dallas, Texas 75225, and Jenkins No. 1, LLC (**"Assignee"**), a Texas limited liability company, whose address is 3500 Fairmount Street, Suite 314, Dallas, Texas 75219. Assignor and Assignee are jointly referred to in this Assignment as the **"Parties"** and individually as a **"Party"**.

## W I N E S S E T H:

Reference is hereby made to that certain Purchase and Sale Agreement, dated effective as of August 31, 2016, by and between Assignor and Assignee (the **"Purchase Agreement"**). Any capitalized term used in this Assignment, but not defined in this Assignment, shall have the meaning assigned to such term in the Purchase Agreement.

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the other terms and provisions of this Assignment, Assignor hereby assigns, conveys and transfers to Assignee, its successors and assigns, as of the Effective Time, and Assignee hereby accepts from Assignor as of the Effective Time, all of Assignor's right, title and interests in, to and under the following (the **"Assets"**):

a.    The salt water disposal lease described in Exhibit A hereto, and any ratifications and/or amendments to such lease, whether or not such ratifications or amendments are described in Exhibit A insofar, and only insofar, as they cover the lands described on Exhibit A (the **"Leases"**);

b.    The salt water disposal wells located on the Leases identified in Exhibit A hereto and all property and equipment located thereon and used in connection therewith, including, but not limited to pumps, platforms, well equipment (surface and subsurface), water wells, lines and facilities on the Leases (the **"Equipment"**);

c.    To the extent transferable, all contracts and contractual rights insofar as they relate to the Leases and Equipment including, but not limited to, servitudes, easements, rights-of-way, permits, surface leases and rights, subleases and assignments, operating agreements, licenses, orders and similar rights leased or owned by Assignor; and

d.    The fee surface estate covering approximately 3.12 acres as described in Exhibit B hereto.

Plaintiffs' Exs 32

TO HAVE AND TO HOLD the Assets unto Assignee, its successors and assigns, subject to and in accordance with the terms and provisions of this Assignment and the Purchase Agreement.

This Assignment is made and accepted expressly subject to the following:

1.     **Purchase Agreement Controls**. This Assignment does not amend the Purchase Agreement. The Purchase Agreement remains in full force and effect in accordance with its terms and provisions. This Assignment is expressly made subject in all respects to the terms and provisions of the Purchase Agreement. By executing, delivering and accepting this Assignment, the Parties do not intend to cause a merger of the terms of the Purchase Agreement into this Assignment, and all covenants, disclaimers, representations, warranties, indemnities and other terms and provisions set forth in the Purchase Agreement shall remain in full force and effect on and after the date of this Assignment.

2.     **Assumption**. Assignee hereby assumes and agrees to pay, perform and otherwise discharge when due, all liabilities and obligations pertaining to the Assets arising or accruing on or after the Effective Time.

3.     **Binding Effect**. This Assignment binds and inures to the benefit of the Parties and their respective successors and assigns.

4.     **Exhibits**. Unless expressly indicated otherwise, any reference in this Assignment to an Exhibit is a reference to the stated Exhibit attached to this Assignment. The Exhibits are incorporated into this Assignment and made a part of this Assignment. Any reference to "this Assignment" includes such Exhibits.

5.     **Governing Law**. This Assignment shall be governed and construed according to the laws of the state of Texas, excluding any conflicts-of-law rules or principle that might apply the law of another jurisdiction. All disputes related to this Assignment shall be brought and maintained exclusively within the jurisdiction of the state and federal courts of the state of Texas, and venue shall lie exclusively in the state or federal courts situated in Dallas County, Texas.

6.     **Construction**. The words "this Assignment," "herein," "hereby," "hereunder" and words of similar import refer to this Assignment as a whole and not to any particular subdivision unless expressly so limited. The phrases "this Section" and similar phrases refer only to the Sections hereof in which the phrase occurs. The word "or" is not exclusive, and "including" (and its various derivatives), means "including without limitation". Pronouns in masculine, feminine and neuter gender shall be construed to include any other gender. Words in the singular form shall be construed to include the plural and words in the plural form shall be construed to include the singular, unless the context otherwise requires. In the event an ambiguity or question of intent or interpretation of this Assignment arises, this Assignment shall be construed as if jointly drafted by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring a Party as a result of authorship or drafting of any provision of this Assignment.

2

Plaintiffs' Exs 33

7.    **Execution.** This Assignment may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. The exchange of copies of this Assignment and of signature pages by facsimile or e-mail transmission shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of the original Assignment for all purposes. Signatures of the Parties transmitted by facsimile or e-mail transmission shall be deemed to be their original signatures for all purposes.

(Signature page follows.)

Plaintiffs' Exs 34

Assignor and Assignee have executed this Assignment on September 9, 2016, to be effective as of the Effective Time.

**ASSIGNOR:**

OWL JENKINS SWD, LLC
By:  OWL Permian, LLC, its sole member


By: _____
   Name:
   Title:


**ASSIGNEE:**

JENKINS NO. 1 LLC


By: _____
Name:
Title:

Plaintiffs' Exs 35

STATE OF TEXAS      §
§
COUNTY OF DALLAS    §

This instrument was acknowledged before me this ____ day of September, 2016, by _____, as _____ of OWL Permian, LLC, a Texas limited liability company, as sole member of OWL Jenkins SWD, LLC, a Texas limited liability company, on behalf of said limited liability companies.


_____
Notary Public, State of Texas


STATE OF TEXAS      §
§
COUNTY OF DALLAS    §

This instrument was acknowledged before me this ____ day of September, 2016, by _____, as the _____ of Jenkins No. 1 LLC, a Texas limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

521060 000078 18451590.3

Plaintiffs' Exs 36

EXHIBIT A

Legal Description: Jenkins NO. 1 (000000) LEASE, SPRABERRY (TREND AREA) FIELD
ANDREWS COUNTY, DISTRICT 08

Survey Coordinates: 471' FNL, 574' FEL, Section 23, Block 3, A-312, E/2, OB Holt Survey
Railroad Commission of Texas Permit #1443

The lands described in that certain Corrected Assignment and Bill of Sale dated effective
December 6, 2012 from Hydro Waste Corp. to Aggietech Operating, LLC, recorded in the
Official Records of Andrews County, Texas on June 24, 2014, as Instrument # 14-3166.

6

Plaintiffs' Exs 37

EXHIBIT B

[SEE ATTACHED]

7

Plaintiffs' Exs 38

EXHIBIT D

FORM OF PROMISSORY NOTE

Plaintiffs' Exs 39

# PROMISSORY NOTE

$700,000.00                                  Dallas, Texas                                  September 9, 2016

FOR VALUE RECEIVED, the undersigned, Jenkins No. 1, LLC, hereby promises to pay to the order of OWL Jenkins SWD, LLC ("**Lender**") the principal sum of Seven Hundred Thousand and no/100 Dollars ($700,000.00), together with interest on the unpaid balance thereof from the date hereof until maturity, at the rate of ten percent (10%) per annum with both principal and interest payable as hereinafter provided in lawful money of the United States of America at 8214 Westchester Drive, Suite 850, Dallas, Texas or at such other place within Dallas County, Texas as from time to time may be designated by the holder of this Promissory Note (this "**Note**"). Accrued interest on the unpaid principal of this Note shall be computed on the basis of a 365 day, year and the actual number of days elapsed.

All past due principal and/or interest or installments thereof shall bear interest at the highest rate for which the undersigned may legally contract under applicable law or, if no such rate is designated under applicable law, at the rate of eighteen percent (18%) per annum.

The principal of and interest on this Note shall be due and payable in sixteen quarterly installments of Fifty-Three Thousand Six Hundred Nineteen and 29/100 Dollars ($53,619.29) each, payable on the last day of each November, February, May and August of each year, beginning November 30, 2016, and continuing regularly thereafter until August 31, 2020, on which date all unpaid principal of and accrued interest on this Note shall be due and payable. An amortization schedule is attached hereto as Schedule 1.

This Note is secured by a Deed of Trust, Security Agreement and Assignment Of Disposal Fees and Mortgage (hereinafter called the "**Deed of Trust**") of even date herewith in favor of Nevin Bannister, as trustee for Lender, evidencing a lien on certain real property situated in Andrews County, Texas, described therein, to which Deed of Trust reference is here made for a description of the property covered thereby and the nature and extent of the security and the rights and powers of Lender in respect of such security. Upon the failure to pay any installment of the unpaid principal of or unpaid accrued interest on this Note as above promised or upon the occurrence of a default specified in the Deed of Trust, the holder of this Note or any part thereof shall have the option of declaring the unpaid principal balance hereof and the unpaid interest accrued hereon to be immediately due and payable.

The undersigned shall have the right to prepay, without penalty, at any time and from time to time prior to maturity, all or any part of the unpaid principal balance of this Note and/or all or any part of the unpaid interest accrued to the date of such prepayment, provided that any such principal thus paid is accompanied by all unpaid accrued interest on such principal. Any partial prepayments of principal shall be applied to installments thereof in the inverse order of maturity.

Nothing herein contained shall prevent or shall be construed to prevent the holder of this Note or any part thereof from exercising and enforcing any other remedy allowed at law or

1

521060 000078 18451240.6

Plaintiffs' Exs 40

equity or by any statute or by the terms of the Deed of Trust, or any other deed of trust, mortgage, security agreement or any other security instrument of any kind now or hereafter securing the payment of this Note.

Each of the following events constitutes an "Event of Default" under this Note:

(a)     The undersigned fails to pay any indebtedness under or in respect of this Note when due by maturity, acceleration or otherwise, or fails to pay any indebtedness owing on a demand basis upon demand, or any other indebtedness owing to Lender when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of demand, acceleration or otherwise;

(b)     The undersigned:

(i)     suffers the entry against it of a judgment, decree or order for relief by a court of competent jurisdiction in an involuntary proceeding commenced under any applicable bankruptcy, insolvency or other similar law of any jurisdiction now or hereafter in effect, including the United States Bankruptcy Code, as from time to time amended, or has any such proceeding commenced against it which remains undismissed for a period of thirty (30) days; or

(ii)     commences a voluntary case under any applicable bankruptcy, insolvency or similar law now or hereafter in effect, including the United States Bankruptcy Code, as from time to time amended; or applies for or consents to the entry of an order for relief in an involuntary case under any such law; or makes a general assignment for the benefit of creditors; or fails generally to pay (or admits in writing its inability to pay) its debts as such debts become due; or takes limited liability company or other action to authorize any of the foregoing; or

(iii)     suffers the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of all or a substantial part of its assets or of any part of any collateral constituting continuing collateral security for indebtedness under or in respect of this Note in a proceeding brought against or initiated by it, and such appointment or taking possession is neither made ineffective nor discharged within thirty (30) days after the making thereof, or such appointment or taking possession is at any time consented to, requested by, or acquiesced to by it; or

(iv)     suffers a writ or warrant of attachment or any similar process to be issued by any court against all or any substantial part of its assets or any part of any collateral constituting continuing collateral security for indebtedness under or in respect of this Note, and such writ or warrant of attachment or any similar process is not stayed or released within thirty (30) days after the entry or levy thereof or after any stay is vacated or set aside.

Upon the occurrence of an Event of Default described in subsection (b)(i), (b)(ii) or (b)(iii) above with respect to the undersigned, the entire principal balance of this Note and all interest accrued thereon shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by the undersigned.   During the

2

Plaintiffs' Exs 41

continuance of any other Event of Default, Lender at any time and from time to time may, without notice to the undersigned, declare the entire principal balance of this Note and all interest accrued thereon immediately due and payable, and all such principal and interest shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by undersigned.

In case any one or more of the Events of Default specified above shall have occurred and this Note has become immediately due and payable as provided above, Lender may proceed to protect and enforce its rights either by suit in equity or by action at law, or both.

No remedy conferred in this Note upon Lender is intended to be exclusive of any other remedy to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

No course of dealing between the undersigned, on the one hand, and any holder of this Note, on the other hand, and no delay by any such holder in exercising any rights hereunder shall operate as a waiver of any rights of any such holder.

It is the intent of Lender and the undersigned in the execution of this Note and all other instruments now or hereafter securing this Note to contract in strict compliance with applicable usury law. In furtherance thereof, Lender and the undersigned stipulate and agree that none of the terms and provisions contained in this Note, or in any other instrument executed in connection herewith, shall ever be construed to create a contract to pay for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect. Neither the undersigned nor any guarantors, endorsers or other parties hereafter becoming liable for payment of this Note shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon at a rate in excess of the maximum amount that may be lawfully charged under applicable law from time to time in effect, and that the provisions of this paragraph shall control over all other provisions of this Note and any other instruments now or hereafter executed in connection herewith which may be in conflict or apparent conflict herewith. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges in the event that the maturity of this Note is accelerated. If (a) the maturity of this Note is accelerated for any reason, or this Note is prepaid and as result any amounts held to constitute interest are determined to be in excess of the legal maximum, or (b) Lender shall otherwise collect moneys which are determined to constitute interest which would otherwise increase the interest on this Note to an amount in excess of that permitted to be charged by applicable law then in effect, then all sums determined to constitute interest in excess of such legal limited shall, without penalty, be promptly applied to reduce the then outstanding principal of this Note or, at holder's option, be promptly returned to the undersigned or the other payor thereof upon such determination.

In determining whether or not the interest paid or payable, under any specific circumstance, exceeds the maximum amount permitted under applicable law, Lender and the undersigned (and any other payors thereof) shall to the greatest extent permitted under applicable law (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate,

3

Plaintiffs' Exs 42

allocate, and spread the total amount of interest throughout the entire contemplated term of this Note in accordance with the amounts outstanding thereunder and the maximum legal rate of interest permitted under applicable law.   By execution of this Note the undersigned acknowledges that it believes the loan evidenced by this Note to be non-usurious and agrees that if, at any time, the undersigned should have reason to believe that such loan is in fact usurious, it will give Lender notice of such condition and the undersigned agrees that said holder shall have ninety (90) days in which to make appropriate refund or other adjustment in order to correct such condition if in fact such exists.  The term "applicable law" as used in this Note shall mean the laws of the State of Texas or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

Should the indebtedness represented by this Note or any part thereof be collected at law or in equity or through any bankruptcy, receivership, probate or other court proceedings or if this Note is placed in the hands of attorneys for collection after default, the undersigned and all endorsers, guarantors and sureties of this Note jointly and severally agree to pay to the holder of this Note in addition to the principal and interest due and payable hereon all the costs and expenses of said holder in enforcing this Note including, without limitation, reasonable attorneys' fees and legal expenses.

The undersigned and all endorsers, guarantors and sureties of this Note and all other persons liable or to become liable on this Note severally waive presentment for payment, demand, notice of demand and of dishonor and nonpayment of this Note, notice of intention to accelerate the maturity of this Note, notice of the acceleration of the maturity of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party, and agree to all renewals, extensions, modifications, or changes in any manner of or in this Note or in any of its terms, provisions and covenants, partial payments, releases or substitutions of any security, in whole or in part, or any delay, indulgence or other act of any trustee or any holder hereof, with or without notice, whether before or after maturity.  The failure of a party to insist upon strict adherence to any term of this Note on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other terms of this Note.  Any waiver must be in writing.

THIS NOTE AND THE RIGHTS AND DUTIES AND LIABILITIES OF THE PARTIES HEREUNDER AND/OR ARISING FROM OR RELATING IN ANY WAY TO THE INDEBTEDNESS EVIDENCED BY THIS NOTE SHALL BE GOVERNED AND CONSTRUED FOR ALL PURPOSES BY THE LAW OF THE STATE OF TEXAS AND THE LAW OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN SUCH STATE.  THE PARTIES HEREUNDER HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF SUCH STATE.

The terms of this Note shall be binding upon and shall inure to the benefit of any successors or assigns of the undersigned and of Lender, except that the undersigned may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender.

4

521060 000078 18451240.6

Plaintiffs' Exs 43

Any term or provision of this Note which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the terms and provisions of this Note or affecting the validity or enforceability of any of the terms or provisions of this Note in any other jurisdiction.

All notices, demands or other communications to be given or delivered under by reason of the provisions of this Note shall be in writing and shall be deemed to have been given when delivered personally to the recipient or sent to the recipient by reputable overnight courier service (charges prepaid).

JENKINS NO. 1, LLC

By:_____
      Name:
      Title:

521060 000078 18451240.6

Plaintiffs' Exs 44

Schedule 1

**Jenkins Note Payment Schedule**

| Payment # | Payment Date | Beginning Balance | Quarterly Payment | Interest | Principle | Ending Balance |
|---|---|---|---|---|---|---|
| 1 | 12/1/2016 | $700,000.00 | $53,619.29 | $17,500.00 | $36,119.29 | $663,880.71 |
| 2 | 3/1/2017 | $663,880.71 | $53,619.29 | $16,597.02 | $37,022.27 | $626,858.43 |
| 3 | 6/1/2017 | $626,858.43 | $53,619.29 | $15,671.46 | $37,947.83 | $588,910.60 |
| 4 | 9/1/2017 | $588,910.60 | $53,619.29 | $14,722.77 | $38,896.53 | $550,014.08 |
| 5 | 12/1/2017 | $550,014.08 | $53,619.29 | $13,750.35 | $39,868.94 | $510,145.14 |
| 6 | 3/1/2018 | $510,145.14 | $53,619.29 | $12,753.63 | $40,865.66 | $469,279.47 |
| 7 | 6/1/2018 | $469,279.47 | $53,619.29 | $11,731.99 | $41,887.31 | $427,392.17 |
| 8 | 9/1/2018 | $427,392.17 | $53,619.29 | $10,684.80 | $42,934.49 | $384,457.68 |
| 9 | 12/1/2018 | $384,457.68 | $53,619.29 | $9,611.44 | $44,007.85 | $340,449.83 |
| 10 | 3/1/2019 | $340,449.83 | $53,619.29 | $8,511.25 | $45,108.05 | $295,341.78 |
| 11 | 6/1/2019 | $295,341.78 | $53,619.29 | $7,383.54 | $46,235.75 | $249,106.03 |
| 12 | 9/1/2019 | $249,106.03 | $53,619.29 | $6,227.65 | $47,391.64 | $201,714.39 |
| 13 | 12/1/2019 | $201,714.39 | $53,619.29 | $5,042.86 | $48,576.43 | $153,137.96 |
| 14 | 3/1/2020 | $153,137.96 | $53,619.29 | $3,828.45 | $49,790.84 | $103,347.12 |
| 15 | 6/1/2020 | $103,347.12 | $53,619.29 | $2,583.68 | $51,035.61 | $52,311.50 |
| 16 | 9/1/2020 | $52,311.50 | $53,619.29 | $1,307.79 | $52,311.50 | $0.00 |

Plaintiffs' Exs 45

EXHIBIT E

FORM OF MORTGAGE

Plaintiffs' Exs 46

## Exhibit A

## Legal Description and Operating Permit

Legal Description: Jenkins NO. 1 (000000) LEASE, SPRABERRY (TREND AREA) FIELD ANDREWS COUNTY, DISTRICT 08

Survey Coordinates: 471' FNL, 574' FEL, Section 23, Block 3, A-312, E/2, OB Holt Survey

Railroad Commission of Texas Permit #1443

The lands described in that certain Corrected Assignment and Bill of Sale dated effective December 6, 2012 from Hydro Waste Corp. to Aggietech Operating, LLC, recorded in the Official Records of Andrews County, Texas on June 24, 2014, as Instrument # 14-3166.

521060 000078 18291395.4

## Exhibit B


## See Attached


521060 000078 18291395.4

## FIELD NOTES

Being 3.61 acres out of the O.B. Holt Pre-Emption survey (Vol. 1, Pg. 409, Deed Records), and out of a 7.327 acre survey ( Vol. 674, Pg. 165, A.C.D.R.) being out of the Southern portion of the Hilory G. Bedford Survey B-5, Certificate No. SF 13535, and being more particularly described by metes and bounds as follows:

BEGINNING at a ½" I.R. found in the West line of Section 24, Block 3, P.S.L, being a NE corner of said 7.327 acre tract and the NE corner of this survey, from whence a 3/4" I.P. found in pavement bears N 15°12'15" W (BASE BEARING- Vol. 895, Pg. 531. A.C.D.R.) a distance of 2,726.29 feet;

THENCE, S 15°12'15" E along said West line a distance of 10.00 feet to a 1" I.P. found at the SW corner of said Section 24 and the NW corner of Section 25, for a corner of said Hilory G. Bedford survey, and said 7.327 acre survey, and for a corner of this survey.

THENCE, S 73°56'49" W at 242.43 feet pass the East line of said O.B. Holt Pre-Emption survey, in all a distance of 647.31 feet to a ½" I.R. w/cap set for a corner of this survey;

THENCE, S 15°38'17" E a distance of 632.18 feet to a ½" I.R. w/cap set for a southerly corner of this survey;

THENCE, S 73°56'49" W a distance of 270.00 feet to a ½" I.R. w/cap set for a southerly corner of this survey;

THENCE, N 15°38'17" W a distance of 375.00 feet to a ½" I.R. w/cap set for a NW corner of this survey;

THENCE, N 73°56'49" E a distance of 210.00 feet to a ½" I.R. w/cap set for a corner of this survey;

THENCE, N 15°38'17" W a distance of 316.63 feet to a ½" I.R. w/cap set in the North line of said O.B. Holt Pre-Emption survey and in the South line of said J.O. Holt Survey (Vol. 1, Pg. 93, A.C.D.R.) for a North Eastern corner of this survey;

THENCE, N 73°56'49" E along the South line of said J.O. Holt Survey and the North line of said O.B. Holt Pre-Emption survey a distance of 463.62 feet to a ½" I.R. found w/ T-post for a NE corner of said O.B. Holt Pre-Emption survey and a corner of this survey;

THENCE, N 73°55'56" E along the North line of said 7.327 acre survey a distance of 213.03 feet to a ½" I.R. found for a NE corner of said 7.327 acre survey and a NE corner of this survey;

THENCE, S 15°26'45" E a distance of 49.40 feet to a ½" I.R. found for a NE corner of said 7.327 acre survey and a corner of this survey;

THENCE, N 74°39'35" E along the North line of said 7.327 acre survey a distance of 29.60 feet to the point of beginning.

Containing 3.61 acres of land.

James E. Tompkins R.P.L.S. 1985

April 05, 2011

WTC48144-J.T.A.

EXHIBIT C

FORM OF ASSIGNMENT AND BILL OF SALE

[SEE ATTACHED]

Plaintiffs' Exs 50

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OF YOUR DRIVER'S LICENSE NUMBER.

## DEED OF TRUST, SECURITY AGREEMENT AND
## ASSIGNMENT OF DISPOSAL FEES

THAT THE UNDERSIGNED, JENKINS NO. 1, LLC, a Texas limited liability company ("Grantor"), whose address is 3500 Fairmount Street, Suite 314, Dallas, Texas 75219, for and in consideration of the sum of Ten Dollars ($10.00) to Grantor in hand paid by NEVIN BANNISTER, as trustee (the "Trustee"), whose address is 8214 Westchester Drive, Suite 850, Dallas, Texas 75225, in order to secure the payment of the indebtedness hereinafter referred to and the performance of the obligations, covenants, agreements and undertakings of Grantor hereinafter described, does hereby GRANT, BARGAIN, SELL, CONVEY, TRANSFER, ASSIGN and SET OVER to the Trustee:

(a)   The salt water disposal lease described in Exhibit A hereto, and any ratifications and/or amendments to such lease, whether or not such ratifications or amendments are described in Exhibit A insofar, and only insofar, as they cover the lands described on Exhibit A (the "Leases");

(b)   The salt water disposal wells located on the Leases identified in Exhibit A hereto and all property and equipment located thereon and used in connection therewith, including, but not limited to pumps, platforms, well equipment (surface and subsurface), water wells, lines and facilities on the Leases (the "Equipment");

(c)   All contracts and contractual rights insofar as they relate to the Leases and Equipment including, but not limited to, servitudes, easements, rights-of-way, permits, surface leases and rights, subleases and assignments, operating agreements, licenses, orders and similar rights leased or owned by Grantor; and

(d)   The fee surface estate covering approximately 3.12 acres as described in Exhibit B hereto.

TO HAVE AND TO HOLD the property described above (the "Mortgaged Property") unto the Trustee and his successors or substitutes in this trust and to his or their successors and assigns, IN TRUST, however, upon the terms, provisions and conditions herein set forth .

In order to secure the payment of the indebtedness hereinafter referred to and the performance of the obligations, covenants, agreements and undertakings of Grantor hereinafter described, Grantor hereby grants to Beneficiary (as hereinafter defined) a security interest in each of the following now or hereafter owned by Grantor (the "Collateral") and all proceeds of the Collateral:

DEED OF TRUST- Page 1

521060 000078 18451342.4

Plaintiffs' Exs 51

(i)     all goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature now or hereafter attached or affixed to or used in and about the buildings or other improvements now erected or hereafter to be erected on the land covered by the Lease, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing;

(ii)    all proceeds (including premium refunds) of each policy of insurance relating to the Mortgaged Property or any Collateral;

(iii)   all proceeds from the taking of the Mortgaged Property or any Collateral or any part thereof or any interest therein or right or estate appurtenant thereto by eminent domain or by purchase in lieu thereof;

(iv)    all contracts related to the Mortgaged Property or any Collateral;

(v)     all money, funds, accounts, instruments, documents, general intangibles (including trademarks, trade names, domain names and symbols used in connection therewith), and notes or chattel paper arising from or related to the Mortgaged Property or any Collateral, including any funds deposited or set aside for the payment of taxes or insurance premiums related to the Mortgaged Property or any Collateral; and

(vi)    all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Mortgaged Property or any Collateral.

The Mortgaged Property and the Collateral are herein sometimes collectively called the "Property".

1.    Indebtedness.

   1.1    Description of the Indebtedness.  This Deed of Trust, Security Agreement and Assignment of Disposal Fees (this "Deed of Trust") is made to secure and enforce the payment of the following (collectively, the "Indebtedness"):

      (a)    Note.  That certain Promissory Note in the original principal amount of $700,000.00 and with interest at the rate or rates therein provided, both principal and interest being payable as therein provided and all amounts remaining unpaid thereon being finally due and payable on or before August 31, 2020, such note being of even dated September 9, 2016, and executed by Grantor payable to the order of OWL Jenkins SWD, LLC and all other notes given in substitution therefor or in modification, increase, renewal or extension thereof, in whole or in part (such note and all other notes given in substitution therefor or in modification, increase, renewal or extension thereof, in whole or in part, are hereinafter collectively called the "Note", and the original payee named in

DEED OF TRUST- Page 2

Plaintiffs' Exs 52

the Note and all subsequent holders of the Note or any part thereof or any interest therein or any of the "Indebtedness" are hereinafter collectively called the "Beneficiary").

    (b)    Other Indebtedness.    All indebtedness, obligations and liabilities of Grantor to Beneficiary under this Deed of Trust and any other indebtedness, obligations and liabilities of any kind or character, now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several or joint and several.

2.    Covenants.

    2.1    Covenants and Agreements.  So long as the Indebtedness or any part thereof remains unpaid, Grantor covenants and agrees with Beneficiary as follows:

    (a)    Operation of Property.  Grantor shall operate and keep the Property in a safe, good and workmanlike manner and in accordance with all laws, statutes, ordinances, rules, regulations, orders, determinations and court decisions (all of the foregoing are hereinafter sometimes collectively called "Applicable Laws") and shall pay all fees or charges of any kind in connection therewith.  If Grantor receives a notice or claim that the Property is not in compliance with any Applicable Law, Grantor shall promptly furnish a copy of such notice or claim to Beneficiary.

    (b)    Taxes.  Grantor shall cause to be paid prior to delinquency all taxes and assessments heretofore or hereafter levied or assessed (i) against the Property or any part thereof or (ii) against the Trustee or Beneficiary for or on account of the Note or the other Indebtedness or the interest created by this Deed of Trust.  Grantor shall furnish Beneficiary with evidence of each payment of such taxes and assessments at least ten (10) days prior to the date such payment may become past due; except that Grantor may in good faith, by appropriate proceedings, contest the validity, applicability, or amount of any ad valorem tax or assessment against the Property, and pending such contest Grantor shall not be deemed in default hereunder.

    (c)    Repair and Maintenance.  Grantor shall keep the Property in good order and repair, causing all necessary repairs and replacements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to deteriorate.  Grantor shall promptly replace all worn-out fixtures or personal property covered by this Deed of Trust with fixtures or personal property comparable to the replaced fixtures or personal property when new.

    (d)    Insurance and Casualty. Grantor shall keep the Property insured against loss or damage by fire, tornado and such other hazards as are from time to time included in "all risks coverage" or as Beneficiary requires from time to time in an amount equal to one hundred percent (100%) of the full replacement value of all of the improvements on the Mortgaged Property under policies of fire, extended coverage and other insurance issued by such company or companies, in such amounts, upon such terms and provisions,

521060 000078 18451342.4

Plaintiffs' Exs 53

and with such endorsements (including without limitation a co-insurance provision or endorsement), all as is acceptable to Beneficiary.  Grantor shall deliver to Beneficiary certified copies of the original policies evidencing such insurance and any additional insurance which shall be taken out upon any part of the Property and receipts evidencing the payment of all premiums, and will deliver certificates evidencing renewals of all such policies of insurance to Beneficiary at least thirty (30) days before any such insurance shall expire.  All such policies shall provide that proceeds thereunder will be payable to Beneficiary as its interest may appear (or to Beneficiary's designee) pursuant and subject to a mortgage clause (without contribution) of standard form attached to or otherwise made a part of the applicable policy.  In the event of foreclosure of this Deed of Trust, or other transfer of title to the Property in extinguishment in whole or in part of the Indebtedness, all right, title and interest of Grantor in and to such policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Beneficiary or other transferee in the event of such other transfer of title.

(e)    Condemnation.  Immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Property or any portion thereof, or any other proceedings arising out of injury or damage to the Property, or any portion thereof, Grantor shall notify Beneficiary of the pendency of such proceedings. All proceeds of condemnation awards or proceeds of sale in lieu of condemnation with respect to the Property and all judgments, decrees and awards for injury or damage to the Property shall be paid to Beneficiary and shall be applied, first, to reimburse Beneficiary or the Trustee for all costs and expenses, including reasonable attorneys' fees, incurred in connection with collection of such proceeds and, second, the remainder of the proceeds shall be applied, at the discretion of Beneficiary, to the payment of the Indebtedness (without premium or penalty) in the order determined by Beneficiary.  In any event the unpaid portion of the Indebtedness shall remain in full force and effect and Grantor shall not be excused in the payment thereof.  In the event any of the foregoing proceeds are applied to the repair, restoration or replacement of the Property, Grantor shall promptly commence and complete such repair, restoration or replacement of the Property as nearly as possible to its value, condition and character immediately prior to such damage or taking.  Grantor hereby assigns and transfers all such proceeds, judgments, decrees and awards to Beneficiary for application as provided herein.

(f)    Indemnification.  Grantor shall indemnify and hold harmless the Trustee and Beneficiary from and against, and reimburse them for, all claims, demands, liabilities, losses, damages, causes of action, judgments, penalties, costs and expenses (including, without limitation, reasonable attorneys' fees) which may be imposed upon, asserted against or incurred or paid by them by reason of, on account of or in connection with (i) any bodily injury or death or property damage occurring in or upon the Property through any cause whatsoever, (ii) any breach of this Deed of Trust by Grantor hereunder, or (iii) any violation by Grantor or the Property of Applicable Laws, including Applicable Laws pertaining to health or the environment.  This indemnity will survive

DEED OF TRUST- Page 4

521060 000078 18451342.4

Plaintiffs' Exs 54

any foreclosure or termination of this Deed of Trust. **WITHOUT LIMITATION, THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO CLAIMS, DEMANDS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, JUDGMENTS, PENALTIES, COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES) WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (OR ANY OTHER) INDEMNIFIED PARTY.**

2.2    Right of Beneficiary to Perform.   Grantor agrees that, if Grantor fails to perform any act or to take any action which hereunder Grantor is required to perform or take, or to pay any money which hereunder Grantor is required to pay, or takes any action prohibited hereby, Beneficiary may, but shall not be obligated to, perform or cause to be performed such act or take such action or pay such money or remedy any action so taken, and any expenses so incurred by Beneficiary, and any money paid by Beneficiary in connection therewith, shall be a demand obligation owing by Grantor to Beneficiary and Beneficiary, upon making such payment, shall be subrogated to all of the rights of the person, corporation or body politic receiving such payment. Any amounts due and owing by Grantor to Beneficiary pursuant to this Deed of Trust shall bear interest from the date such amount becomes due until paid at the rate of interest payable on matured but unpaid principal of or interest on the Note and shall be a part of the Indebtedness and shall be secured by this Deed of Trust and by any other instrument securing the Indebtedness.

3.    Assignment of Income, Profits and Proceeds.

3.1    Assignment.   To provide a source of future payment of the Indebtedness, Grantor does hereby absolutely and unconditionally assign, transfer and set over to Beneficiary all of the disposal fees, income, receipts, revenues, issues, profits and other sums of money (collectively, "Disposal Fees") that are now or at any time hereafter become due and payable to Grantor arising or issuing from or out of the Mortgaged Property. Disposal Fees covered by this assignment shall also include any money Grantor is entitled to recover from any lessee in bankruptcy such as, without limitation, money recoverable for use of any part of the Mortgaged Property. This assignment shall include, without limitation, the immediate and continuing right to collect and receive Disposal Fees.

3.2    Collections Before and After Default.   Until receipt from Beneficiary of notice of the occurrence of an Event of Default specified in this Deed of Trust (a "Notice of Default"), each person owing Disposal Fees to Grantor with respect to the Mortgaged Property may pay the Disposal Fees directly to Grantor and Grantor shall have the right to receive such Disposal Fees. Upon receipt from Beneficiary of a Notice of Default, each person owing Disposal Fees to Grantor with respect to the Mortgaged Property is hereby authorized and directed to pay directly to Beneficiary all Disposal Fees thereafter accruing and the receipt of Disposal Fees by Beneficiary shall be a release of such person to the extent of all amounts so paid. The receipt by a person of a Notice of Default shall be sufficient authorization for such person to make all future payments of Disposal Fees directly to Beneficiary and each such person shall be entitled

DEED OF TRUST- Page 5

Plaintiffs' Exs 55

to rely on such Notice of Default and shall have no liability to Grantor for any Disposal Fees paid to Beneficiary after receipt of the Notice of Default. Without impairing its rights hereunder, Beneficiary may, at its option, at any time and from time to time, release to Grantor any Disposal Fees received by Beneficiary. As between Grantor and Beneficiary, and any person claiming through or under Grantor, the assignment contained in this Section is intended to be absolute, unconditional and presently effective. It shall never be necessary for Beneficiary to institute legal proceedings of any kind whatsoever to enforce the provisions of this Section. Beneficiary shall not be deemed to have taken possession of the Mortgaged Property except on the exercise of any option Beneficiary may have to do so, evidenced by its demand and overt act for such purpose.

3.3    Limitation on Beneficiary's Liability. Beneficiary shall not be liable **(EVEN IF THE BENEFICIARY WAS NEGLIGENT OR OTHERWISE WOULD BE STRICTLY LIABLE)** for any loss sustained by Grantor resulting from Beneficiary's failure to let the Mortgaged Property, or any part thereof, or from any other act or omission of Beneficiary under or relating to the Leases or any other lease or contract covering the Mortgaged Property. Nor shall Beneficiary be obligated to perform or discharge any obligation, duty or liability under any contract covering the Mortgaged Property by reason of the assignment set forth in this Section 3 or the exercise of rights or remedies hereunder. Without limiting the foregoing, Beneficiary shall not be liable **(EVEN IF THE BENEFICIARY WAS NEGLIGENT OR OTHERWISE WOULD BE STRICTLY LIABLE)** for its failure to collect, or its failure to exercise diligence in the collection of, Disposal Fees but shall be accountable only for Disposal Fees that Beneficiary actually receives. This Section 3 shall not operate to place responsibility upon Beneficiary for the control, care, management or repair of the Mortgaged Property, nor for the carrying out of any of the terms and conditions of any contract of Grantor; nor shall it operate to make Beneficiary responsible or liable for any waste committed on the Mortgaged Property by any other parties or for any dangerous or defective condition of the Mortgaged Property, or for any negligence in the management, upkeep, repair or control of the Mortgaged Property resulting in loss or injury or death to any lessee, licensee, employee or stranger.

3.4    Duration of the Assignment. If the Note and all other Indebtedness are paid as the same becomes due and payable and if all of the covenants, warranties, undertakings and agreements made in this Deed of Trust are kept and performed, the assignment set forth in this Section 3 shall no longer be effective.

4.    Events of Default and Remedies.

4.1    Events of Default. As used in this Deed of Trust, the term "Event of Default" shall have the meaning set forth in the Note and shall also include the occurrence of any of the following events:

(a)    without the prior written consent of Beneficiary, Grantor sells, leases, exchanges, assigns, transfers, conveys or otherwise disposes of or is divested of title to all or any part of the Property or any interest therein (except for the disposition of worn-out fixtures or personal property), or legal or equitable title to the Property, or any part

DEED OF TRUST- Page 6

521060 000078 18451342.4

thereof or any interest therein, is vested in any other party in any manner whatsoever, by operation of law or otherwise; or

(b)      without the prior written consent of Beneficiary, Grantor creates, places or permits to be created or placed, or through any act or failure to act, acquiesces in the placing of, or allows to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual (except for this Deed of Trust and the lien for ad valorem taxes on the Property which are not delinquent), security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering the Property, or any part thereof.

4.2      Acceleration.  Upon the occurrence of an Event of Default, Beneficiary shall have the option of declaring all Indebtedness in its entirety to be immediately due and payable, and the liens and security interests evidenced hereby shall be subject to foreclosure in any manner provided for herein or provided for by law as Beneficiary may elect.

4.3      Foreclosure.  Upon the occurrence of an Event of Default, the Trustee, his successor or substitute, is authorized and empowered and it shall be his special duty at the request of Beneficiary to sell the Mortgaged Property or any part thereof situated in the State of Texas at the courthouse of any county in the State of Texas in which any part of the Mortgaged Property is situated, at public vendue to the highest bidder for cash between the hours of 10 o'clock a.m. and 4 o'clock p.m. on the first Tuesday in any month after having given notice of such sale in accordance with the statutes of the State of Texas then in force governing sales of real estate under powers conferred by deed of trust.  Any sale made by the Trustee hereunder may be as an entirety or in such parcels as Beneficiary may request, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as is required by law.  To the extent permitted by law, Grantor hereby waives its right, if any, to require that the Property be sold as separate tracts or units in the event of foreclosure. The sale by the Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Mortgaged Property shall be sold; and, if the proceeds of such sale of less than the whole of the Mortgaged Property shall be less than the aggregate of the Indebtedness and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Mortgaged Property but Beneficiary shall have the right, at its sole election, to request the Trustee to sell less than the whole of the Mortgaged Property.  After each sale, the Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Grantor, conveying the property so sold to the purchaser or purchasers in fee simple with general warranty of title, and shall receive the proceeds of the sale or sales and apply the same as herein provided.  Payment of the purchase price to the Trustee shall satisfy the obligation of purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof.  The power of sale granted herein shall not be exhausted by any sale held hereunder by the Trustee or his substitute or successor, and such power of sale may be exercised from time to time and as many times as

DEED OF TRUST- Page 7

Plaintiffs' Exs 57

Beneficiary may deem necessary until all of the Mortgaged Property has been duly sold and all Indebtedness has been fully paid. In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder and Beneficiary shall have the right to cause a subsequent sale or sales to be made hereunder. Any and all statements of fact or other recitals made in any deed or deeds given by the Trustee or any successor or substitute appointed hereunder as to nonpayment of the Indebtedness, or as to the occurrence of any Event of Default, or as to Beneficiary having declared all of such indebtedness to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of the Trustee or any substitute or successor, or as to the appointment of any substitute or successor trustee, or as to any other act or thing having been duly done by Beneficiary or by such Trustee, substitute or successor, shall be taken as prima facie evidence of the truth of the facts so stated and recited. The Trustee, his successor or substitute, may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of the Trustee, his successor or substitute.

4.4     Proceeds of Sale. The proceeds of any sale held by the Trustee or in foreclosure of the lien evidenced hereby shall be applied:

FIRST, to the payment of all necessary costs and expenses incident to such foreclosure sale, including but not limited to a reasonable fee to the Trustee acting under the provisions of Section 4.3;

SECOND, to the payment in full of the Indebtedness (including specifically without limitation the principal, interest and attorneys' fees due and unpaid on the Note and the amounts due and unpaid and owed to Beneficiary under this Deed of Trust) in such order as Beneficiary may elect; and

THIRD, the remainder, if any there shall be, shall be paid to Grantor or to other parties entitled thereto by law.

4.5     Beneficiary as Purchaser. Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any Beneficiary purchasing at any such sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the Indebtedness owing to such Beneficiary.

4.6     Uniform Commercial Code. Upon the occurrence of an Event of Default, Beneficiary may exercise its rights of enforcement with respect to the Collateral under the Texas Business and Commerce Code, as amended, and in conjunction with, in addition to or in substitution for those rights and remedies:

(a)     Beneficiary may enter upon the Property to take possession of, assemble and collect the Collateral or to render it unusable; and

DEED OF TRUST- Page 8

Plaintiffs' Exs 58

(b)     Beneficiary may require Grantor to assemble the Collateral and make it available at a place Beneficiary designates which is mutually convenient to allow Beneficiary to take possession or dispose of the Collateral; and

(c)     written notice mailed to Grantor as provided herein five (5) days prior to the date of public sale of the Collateral or prior to the date after which private sale of the Collateral will be made shall constitute reasonable notice; and

(d)     any sale made pursuant to the provisions of this Section shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Mortgaged Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Collateral hereunder as is required for such sale of the Mortgaged Property under power of sale; and

(e)     in the event of a foreclosure sale, whether made by the Trustee under the terms hereof, or under judgment of a court, the Collateral and the Mortgaged Property may, at the option of Beneficiary, be sold as a whole; and

(f)     it shall not be necessary that Beneficiary take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this Section is conducted and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale; and

(g)     prior to application of proceeds of disposition of the Collateral to the Indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Beneficiary; and

(h)     any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of the indebtedness or as to the occurrence of any Event of Default, or as to Beneficiary having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Beneficiary, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and

(i)     Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Beneficiary, including the sending of notices and the conduct of the sale, but in the name and on behalf of Beneficiary.

4.7     <u>Remedies Cumulative</u>.  All remedies herein expressly provided for are cumulative of any and all other remedies existing at law or in equity and are cumulative of any and all other remedies provided for in any other instrument securing the payment of the Indebtedness, or any part thereof, or otherwise benefitting Beneficiary.

DEED OF TRUST- Page 9

Plaintiffs' Exs 59

4.8     Delivery of Possession After Foreclosure. In the event there is a foreclosure sale hereunder and at the time of such sale Grantor or Grantor's heirs, devisees, representatives, successors or assigns or any other persons claiming any interest in the Property by, through or under Grantor are occupying or using the Property, or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser. In the event the tenant fails to surrender possession of such property upon demand, the purchaser shall be entitled to institute and maintain an action for forcible entry and detainer of such property in the Justice of the Peace Court in the Justice Precinct in which such property, or any part thereof, is situated.

5.     Miscellaneous.

5.1     Defeasance. If all of the Indebtedness be paid as the same becomes due and payable and if all of the covenants, warranties, undertakings and agreements made in this Deed of Trust are kept and performed, then and in that event only, all rights under this Deed of Trust shall terminate and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Beneficiary in due form at Grantor's cost.

5.2     Successor Trustee. The Trustee may resign by an instrument in writing addressed to Beneficiary, or the Trustee may be removed at any time with or without cause by an instrument in writing executed by Beneficiary. In case of the death, resignation, removal or disqualification of the Trustee or if for any reason Beneficiary shall deem it desirable to appoint a substitute or successor trustee to act instead of the herein named trustee or any substitute or successor trustee, then Beneficiary shall have the right and is hereby authorized and empowered to appoint a successor trustee, or a substitute trustee, without other formality than appointment and designation in writing executed by Beneficiary and the authority hereby conferred shall extend to the appointment of other successor and substitute trustees successively until the indebtedness secured hereby has been paid in full or until the Property is sold hereunder. Upon the making of any such appointment and designation, all of the estate and title of the Trustee in the Property shall vest in the named successor or substitute trustee and he shall thereupon succeed to and shall hold, possess and execute all the rights, powers, privileges, immunities and duties herein conferred upon the Trustee. All references herein to the Trustee shall be deemed to refer to the Trustee (including any successor or substitute appointed and designated as herein provided) from time to time acting hereunder

5.3     Liability and Indemnification of Trustee. **THE TRUSTEE SHALL NOT BE LIABLE FOR ANY ERROR OF JUDGMENT OR ACT DONE BY THE TRUSTEE IN GOOD FAITH, OR BE OTHERWISE RESPONSIBLE OR ACCOUNTABLE UNDER ANY CIRCUMSTANCES WHATSOEVER (INCLUDING THE TRUSTEE'S NEGLIGENCE).** The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder, believed by him in good faith to be genuine. All moneys received by the Trustee shall, until used

DEED OF TRUST- Page 10

Plaintiffs' Exs 60

or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and the Trustee shall be under no liability for interest on any moneys received by him hereunder. **GRANTOR SHALL REIMBURSE THE TRUSTEE FOR, AND INDEMNIFY AND SAVE HIM HARMLESS AGAINST, ANY AND ALL LIABILITY AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) WHICH TRUSTEE MAY INCUR IN THE PERFORMANCE OF HIS DUTIES HEREUNDER, INCLUDING ANY SUCH LIABILITY AND EXPENSES RESULTING FROM TRUSTEE'S OWN NEGLIGENCE.** The foregoing indemnity and other agreements shall not terminate upon release, foreclosure or other termination of this Deed of Trust.

5.4     Waiver by Beneficiary.  Beneficiary may at any time and from time to time (a) waive or not enforce compliance by Grantor with any covenant herein made by Grantor; (b) consent to Grantor doing any act which hereunder Grantor is prohibited from doing, or consent to Grantor failing to do any act which hereunder Grantor is required to do; (c) release any part of the Property, or any interest therein, from the lien and security interest of this Deed of Trust without the joinder of the Trustee, or (d) release any party liable, either directly or indirectly, for the Indebtedness or for any covenant herein or in any other instrument now or hereafter securing the payment of the Indebtedness, without impairing or releasing the liability of any other party. No such act shall in any way impair the rights of Beneficiary hereunder except to the extent specifically agreed to by Beneficiary in writing.

5.5     Actions by Beneficiary.  The lien, security interest and other rights of Beneficiary hereunder shall not be impaired by any indulgence, moratorium or release granted by Beneficiary, including but not limited to (a) any renewal, extension, increase or modification which Beneficiary may grant with respect to any Indebtedness, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Beneficiary may grant in respect of the Property, or any part thereof or any interest therein, or (c) any release or indulgence granted to any endorser or surety of any Indebtedness.

5.6     Rights of Beneficiary.  Beneficiary may waive any Event of Default without waiving any other prior or subsequent Event of Default. Beneficiary may remedy any Event of Default without waiving the Event of Default remedied. Neither the failure by Beneficiary to exercise, nor the delay by Beneficiary in exercising, any right, power or remedy upon any Event of Default shall be construed as a waiver of such Event of Default, nor shall it be construed as a waiver of the right to exercise any such right, power or remedy at a later date. No single or partial exercise by Beneficiary of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time. No modification or waiver of any provision hereof nor consent to any departure by Grantor therefrom shall in any event be effective unless the same shall be in writing and signed by Beneficiary and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to nor demand on Grantor in any case shall of itself entitle Grantor to any other or further notice or demand in similar or other circumstances. Acceptance by Beneficiary of any payment in an amount less than the amount then due on any

DEED OF TRUST- Page 11

Plaintiffs' Exs 61

Indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of any Event of Default hereunder.

5.7    Notification of Account Debtors.   Beneficiary may at any time after Event of Default by Grantor notify the account debtors or obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness included in the Collateral to pay Beneficiary directly.

5.8    Reproduction as Financing Statement.   A carbon, photographic or other reproduction of this Deed of Trust or of any financing statement relating to this Deed of Trust shall be sufficient as a financing statement.

5.9    Fixture Filing.   This Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for record in the real estate records in the Office of the County Clerk where the Property (including such fixtures) is situated.  This Deed of Trust shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section (e) of Section 9.103 of the Texas Business and Commerce Code, as amended, and is to be filed for record in the real estate records of the county where the Property is situated.  The mailing address of Grantor is set forth in the signature page below, as is the address of Beneficiary from which information concerning the security interest may be obtained.

5.10    Dealing with Successor.   In the event the ownership of the Property or any part thereof becomes vested in a person other than Grantor, Beneficiary may, without notice to Grantor, deal with such successor or successors in interest with reference to this Deed of Trust and to the Indebtedness in the same manner as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or for the payment of the Indebtedness.  No sale of the Property, no forbearance on the part of Beneficiary and no extension of the time for the payment of the Indebtedness given by Beneficiary shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Grantor hereunder or for the payment of the Indebtedness or the liability of any other person hereunder or for the payment of the Indebtedness, except as agreed to in writing by Beneficiary.

5.11    Place of Payment.  The Note and all other Indebtedness which may be owing hereunder at any time by Grantor shall be payable at the place designated in the Note.

5.12    Application of Indebtedness.   If any part of the Indebtedness is not, for any reason, lawfully secured by this Deed of Trust, then Beneficiary may without notice to Grantor apply payments made on the Indebtedness first in discharge of the part not secured by this Deed of Trust.  If for any reason any part of the Indebtedness is not lawfully secured by the entire Property, then Beneficiary may without notice to Grantor apply payments made on the Indebtedness first in discharge of that part.  If Beneficiary has full recourse against Grantor for part, but not all, of the Indebtedness for any reason, then Beneficiary may without notice to Grantor apply foreclosure proceeds which are to be applied to the Indebtedness first against that portion of the Indebtedness for which Beneficiary does not have full recourse against Grantor.

DEED OF TRUST- Page 12

Plaintiffs' Exs 62

Similarly, Beneficiary may without notice to Grantor apply any cash payments actually paid by Grantor before final maturity of the Note (by acceleration or otherwise) to the portion of the Indebtedness for which Beneficiary does not have full recourse against Grantor.

5.13    Successors and Assigns.  The terms, provisions, covenants and conditions hereof shall be binding upon Grantor, and the successors and assigns of Grantor including all successors in interest of Grantor in and to all or any part of the Property, and shall inure to the benefit of the Trustee and Beneficiary and their respective successors, substitutes and assigns and shall constitute covenants running with the land.  All references in this Deed of Trust to Grantor, the Trustee or Beneficiary shall be deemed to include all such successors, substitutes and assigns.

5.14    Severability.  A determination that any provision of this Deed of Trust is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Deed of Trust to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

5.15    Gender and Number.  Within this Deed of Trust, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context otherwise requires.

5.16    Counterparts.  This Deed of Trust may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All such counterparts shall be construed together and shall constitute one instrument, but in making proof hereof it shall only be necessary to produce one such counterpart.

5.17    Joint and Several.  Where two or more persons or entities have executed this Deed of Trust, unless the context clearly indicates otherwise, the term "Grantor" as used in this Deed of Trust means the grantors hereunder or either or any of them and the obligations of Grantor hereunder shall be joint and several.

5.18    Modification or Termination.  This Deed of Trust may only be modified or terminated by a written instrument or instruments executed by the party against which enforcement of the modification or termination is asserted.  Any alleged modification or termination which is not so documented shall not be effective as to any party.

5.19    Negation of Partnership.  Nothing contained herein or in the Note is intended to create any partnership, joint venture or association between Grantor and Beneficiary, or in any way make Beneficiary a co-principal with Grantor with reference to the Property, and any inferences to the contrary are hereby expressly negated.

**[Signature page follows.]**

DEED OF TRUST- Page 13

521060 000078 18451342.4

Plaintiffs' Exs 63

EXECUTED on the date of acknowledgment indicated below to be effective as of August 31, 2016.

**GRANTOR:**

JENKINS NO. 1, LLC

By: _____
Name: _Scott Sherman_
Title: _Manager_

THE STATE OF TEXAS

COUNTY OF DALLAS

This instrument was acknowledged before me on September _11_, 2016, by _Scott Sherman, MANAGER_ of Jenkins No. 1, LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public in and for
the State of Texas

DENNIS CARPENTER
MY COMMISSION EXPIRES
May 7, 2019

My Commission Expires: _MAY 7, 2019_

**Address of Grantor:**

3500 Fairmount Street
Suite 314
Dallas, Texas 75219

**Address of Beneficiary:**

8214 Westchester Drive
Suite 850
Dallas, Texas 75225

**AFTER RECORDING RETURN TO:**

Thompson & Knight LLP
1722 Routh Street, Suite 1500
Houston, Texas 75201
Attention: Jerry Sanders

DEED OF TRUST- Page 14

521060 000078 18451342.4

Plaintiffs' Exs 64

## Exhibit A

Legal Description:  Jenkins NO. 1 (000000) LEASE, SPRABERRY (TREND AREA) FIELD
ANDREWS COUNTY, DISTRICT 08

Survey Coordinates:  471' FNL, 574' FEL, Section 23, Block 3, A-312, E/2, OB Holt Survey
Railroad Commission of Texas Permit #1443

The lands described in that certain Corrected Assignment and Bill of Sale dated effective
December 6, 2012 from Hydro Waste Corp. to Aggietech Operating, LLC, recorded in the
Official Records of Andrews County, Texas on June 24, 2014, as Instrument # 14-3166.

521060 000078 18451342.4

Plaintiffs' Exs 65

## Exhibit B

See Attached

DEED OF TRUST – EXHIBIT B - 1

521060 000078 18451342.4

Plaintiffs' Exs 66

## FIELD NOTES

Being 3.61 acres out of the O.B. Holt Pre-Emption survey (Vol. 1, Pg. 409, Deed Records), and out of a 7.327 acre survey ( Vol. 674, Pg. 165, A.C.D.R.) being out of the Southern portion of the Hilory G. Bedford Survey B-5, Certificate No. SF 13535, and being more particularly described by metes and bounds as follows:

BEGINNING at a ½" I.R. found in the West line of Section 24, Block 3, P.S.L, being a NE corner of said 7.327 acre tract and the NE corner of this survey, from whence a 3/4" I.P. found in pavement bears N 15°12'15" W (BASE BEARING- Vol. 895, Pg. 531. A.C.D.R.) a distance of 2,726.29 feet;

THENCE, S 15°12'15" E along said West line a distance of 10.00 feet to a 1" I.P. found at the SW corner of said Section 24 and the NW corner of Section 25, for a corner of said Hilory G. Bedford survey, and said 7.327 acre survey, and for a corner of this survey.

THENCE, S 73°56'49" W at 242.43 feet pass the East line of said O.B. Holt Pre-Emption survey, in all a distance of 647.31 feet to a ½" I.R. w/cap set for a corner of this survey;

THENCE, S 15°38'17" E a distance of 632.18 feet to a ½" I.R. w/cap set for a southerly corner of this survey;

THENCE, S 73°56'49" W a distance of 270.00 feet to a ½" I.R. w/cap set for a southerly corner of this survey;

THENCE, N 15°38'17" W a distance of 375.00 feet to a ½" I.R. w/cap set for a NW corner of this survey;

THENCE, N 73°56'49" E a distance of 210.00 feet to a ½" I.R. w/cap set for a corner of this survey;

THENCE, N 15°38'17" W a distance of 316.63 feet to a ½" I.R. w/cap set in the North line of said O.B. Holt Pre-Emption survey and in the South line of said J.O. Holt Survey (Vol. 1, Pg. 93, A.C.D.R.) for a North Eastern corner of this survey;

THENCE, N 73° 56'49" E along the South line of said J.O. Holt Survey and the North line of said O.B. Holt Pre-Emption survey a distance of 463.62 feet to a ½" I.R. found w/ T-post for a NE corner of said O.B. Holt Pre-Emption survey and a corner of this survey;

THENCE, N 73° 55'56" E along the North line of said 7.327 acre survey a distance of 213.03 feet to a ½" I.R. found for a NE corner of said 7.327 acre survey and a NE corner of this survey;

THENCE, S 15°26'45" E a distance of 49.40 feet to a ½" I.R. found for a NE corner of said 7.327 acre survey and a corner of this survey;

THENCE, N 74°39'35" E along the North line of said 7.327 acre survey a distance of 29.60 feet to the point of beginning.

Containing 3.61 acres of land.

James E. Tompkins R.P.L.S. 1985

April 05, 2011

WTC48144-J.T.A.

**THE STATE OF TEXAS**
**COUNTY OF ANDREWS**

I hereby certify that this instrument was FILED on the
date and the time stamped hereon by me and was duly
RECORDED in the OPR Records of Andrews, Texas.

**16-3497   Pages: 18**
**09/22/2016 02:14 PM**

Kenda Heckler, County Clerk
Andrews, Texas

Plaintiffs' Exs 68

## ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale (this "**Assignment**"), dated effective as of the 31st day of August 2016 at 9:00 a.m. local time at the respective locations of the Purchased Assets (the "**Effective Time**"), is made and entered into by and between OWL Jenkins SWD, LLC ("**Assignor**"), a Texas limited liability company, whose address is 8214 Westchester Drive, Suite 850, Dallas, Texas 75225, and Jenkins No. 1, LLC ("**Assignee**"), a Texas limited liability company, whose address is 3500 Fairmount Street, Suite 314, Dallas, Texas 75219. Assignor and Assignee are jointly referred to in this Assignment as the "**Parties**" and individually as a "**Party**".

## W I N E S S E T H:

Reference is hereby made to that certain Purchase and Sale Agreement, dated effective as of August 31, 2016, by and between Assignor and Assignee (the "**Purchase Agreement**"). Any capitalized term used in this Assignment, but not defined in this Assignment, shall have the meaning assigned to such term in the Purchase Agreement.

For $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the other terms and provisions of this Assignment, Assignor hereby assigns, conveys and transfers to Assignee, its successors and assigns, as of the Effective Time, and Assignee hereby accepts from Assignor as of the Effective Time, all of Assignor's right, title and interests in, to and under the following (the "**Assets**"):

a. The salt water disposal lease described in Exhibit A hereto, and any ratifications and/or amendments to such lease, whether or not such ratifications or amendments are described in Exhibit A insofar, and only insofar, as they cover the lands described on Exhibit A (the "**Leases**");

b. The salt water disposal wells located on the Leases identified in Exhibit A hereto and all property and equipment located thereon and used in connection therewith, including, but not limited to pumps, platforms, well equipment (surface and subsurface), water wells, lines and facilities on the Leases (the "**Equipment**");

c. To the extent transferable, all contracts and contractual rights insofar as they relate to the Leases and Equipment including, but not limited to, servitudes, easements, rights-of-way, permits, surface leases and rights, subleases and assignments, operating agreements, licenses, orders and similar rights leased or owned by Assignor; and

d. The fee surface estate covering approximately 3.12 acres as described in Exhibit B hereto.

Plaintiffs' Exs 69

TO HAVE AND TO HOLD the Assets unto Assignee, its successors and assigns, subject to and in accordance with the terms and provisions of this Assignment and the Purchase Agreement.

This Assignment is made and accepted expressly subject to the following:

1.      **Purchase Agreement Controls**. This Assignment does not amend the Purchase Agreement. The Purchase Agreement remains in full force and effect in accordance with its terms and provisions. This Assignment is expressly made subject in all respects to the terms and provisions of the Purchase Agreement. By executing, delivering and accepting this Assignment, the Parties do not intend to cause a merger of the terms of the Purchase Agreement into this Assignment, and all covenants, disclaimers, representations, warranties, indemnities and other terms and provisions set forth in the Purchase Agreement shall remain in full force and effect on and after the date of this Assignment.

2.      **Assumption**. Assignee hereby assumes and agrees to pay, perform and otherwise discharge when due, all liabilities and obligations pertaining to the Assets arising or accruing on or after the Effective Time.

3.      **Binding Effect**. This Assignment binds and inures to the benefit of the Parties and their respective successors and assigns.

4.      **Exhibits**. Unless expressly indicated otherwise, any reference in this Assignment to an Exhibit is a reference to the stated Exhibit attached to this Assignment. The Exhibits are incorporated into this Assignment and made a part of this Assignment. Any reference to "this Assignment" includes such Exhibits.

5.      **Governing Law**. This Assignment shall be governed and construed according to the laws of the state of Texas, excluding any conflicts-of-law rules or principle that might apply the law of another jurisdiction. All disputes related to this Assignment shall be brought and maintained exclusively within the jurisdiction of the state and federal courts of the state of Texas, and venue shall lie exclusively in the state or federal courts situated in Dallas County, Texas.

6.      **Construction**. The words "this Assignment," "herein," "hereby," "hereunder" and words of similar import refer to this Assignment as a whole and not to any particular subdivision unless expressly so limited. The phrases "this Section" and similar phrases refer only to the Sections hereof in which the phrase occurs. The word "or" is not exclusive, and "including" (and its various derivatives), means "including without limitation". Pronouns in masculine, feminine and neuter gender shall be construed to include any other gender. Words in the singular form shall be construed to include the plural and words in the plural form shall be construed to include the singular, unless the context otherwise requires. In the event an ambiguity or question of intent or interpretation of this Assignment arises, this Assignment shall be construed as if jointly drafted by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring a Party as a result of authorship or drafting of any provision of this Assignment.

2

Plaintiffs' Exs 70

7.   **Execution**. This Assignment may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. The exchange of copies of this Assignment and of signature pages by facsimile or e-mail transmission shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of the original Assignment for all purposes. Signatures of the Parties transmitted by facsimile or e-mail transmission shall be deemed to be their original signatures for all purposes.

(Signature page follows.)

521060 000078 18451590.3

3

Plaintiffs' Exs 71

Assignor and Assignee have executed this Assignment on September 9, 2016, to be effective as of the Effective Time.

**ASSIGNOR:**

OWL JENKINS SWD, LLC
By: OWL Permian, LLC, its sole member

By: _____ COO
Name: Nevin Bannister
Title: COO

**ASSIGNEE:**

JENKINS NO. 1 LLC

By: _____
Name:
Title:

ASSIGNMENT AND BILL OF SALE

STATE OF TEXAS             §
                          §
COUNTY OF DALLAS           §

This instrument was acknowledged before me this 9th day of September, 2016, by
Nevin Bannister , as _____ COO _____ of OWL Permian, LLC, a Texas limited
liability company, as sole member of OWL Jenkins SWD, LLC, a Texas limited liability
company, on behalf of said limited liability companies.

TALEIA R WRIGHT
My Commission Expires
October 4, 2016

_____
Notary Public, State of Texas

STATE OF TEXAS             §
                          §
COUNTY OF DALLAS           §

This instrument was acknowledged before me this ____ day of September, 2016, by
_____, as the _____ of Jenkins No. 1 LLC, a Texas
limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

521060 000078 18451590.3

Plaintiffs' Exs 73

Assignor and Assignee have executed this Assignment on September 9, 2016, to be effective as of the Effective Time.

**ASSIGNOR:**

OWL JENKINS SWD, LLC
By:  OWL Permian, LLC, its sole member


By: _____
    Name:
    Title:


**ASSIGNEE:**

JENKINS NO. 1 LLC

By: _____
Name: _Scott Sherman_
Title: _Manager_

ASSIGNMENT AND BILL OF SALE

Plaintiffs' Exs 74

STATE OF TEXAS     §

                      §

COUNTY OF DALLAS    §

This instrument was acknowledged before me this _____ day of September, 2016, by _____, as _____ of OWL Permian, LLC, a Texas limited liability company, as sole member of OWL Jenkins SWD, LLC, a Texas limited liability company, on behalf of said limited liability companies.

_____

Notary Public, State of Texas

STATE OF TEXAS     §

                      §

COUNTY OF DALLAS    §

This instrument was acknowledged before me this _11th_ day of September, 2016, by _Scott Sherman_, as the _MANAGER_ of Jenkins No. 1 LLC, a Texas limited liability company, on behalf of said limited liability company.

DENNIS CARPENTER
MY COMMISSION EXPIRES
May 7, 2019

_____

Notary Public, State of Texas

5

Plaintiffs' Exs 75

EXHIBIT A

Legal Description: Jenkins NO. 1 (000000) LEASE, SPRABERRY (TREND AREA) FIELD
ANDREWS COUNTY, DISTRICT 08

Survey Coordinates: 471' FNL, 574' FEL, Section 23, Block 3, A-312, E/2, OB Holt Survey
Railroad Commission of Texas Permit #1443

The lands described in that certain Corrected Assignment and Bill of Sale dated effective
December 6, 2012 from Hydro Waste Corp. to Aggietech Operating, LLC, recorded in the
Official Records of Andrews County, Texas on June 24, 2014, as Instrument # 14-3166.

Plaintiffs' Exs 76

## EXHIBIT B

## [SEE ATTACHED]

7

521060 000078 18451590.3

Plaintiffs' Exs 77

### FIELD NOTES

Being 3.61 acres out of the O.B. Holt Pre-Emption survey (Vol. 1, Pg. 409, Deed Records), and out of a 7.327 acre survey ( Vol. 674, Pg. 165, A.C.D.R.) being out of the Southern portion of the Hilory G. Bedford Survey B-5, Certificate No. SF 13535, and being more particularly described by metes and bounds as follows:

BEGINNING at a ½" I.R. found in the West line of Section 24, Block 3, P.S.L, being a NE corner of said 7.327 acre tract and the NE corner of this survey, from whence a 3/4" I.P. found in pavement bears N 15°12'15" W (BASE BEARING- Vol. 895, Pg. 531. A.C.D.R.) a distance of 2,726.29 feet;

THENCE, S 15°12'15" E along said West line a distance of 10.00 feet to a 1" I.P. found at the SW corner of said Section 24 and the NW corner of Section 25, for a corner of said Hilory G. Bedford survey, and said 7.327 acre survey, and for a corner of this survey.

THENCE, S 73°56'49" W at 242.43 feet pass the East line of said O.B. Holt Pre-Emption survey, in all a distance of 647.31 feet to a ½" I.R. w/cap set for a corner of this survey;

THENCE, S 15°38'17" E a distance of 632.18 feet to a ½" I.R. w/cap set for a southerly corner of this survey;

THENCE, S 73°56'49" W a distance of 270.00 feet to a ½" I.R. w/cap set for a southerly corner of this survey;

THENCE, N 15°38'17" W a distance of 375.00 feet to a ½" I.R. w/cap set for a NW corner of this survey;

THENCE, N 73°56'49" E a distance of 210.00 feet to a ½" I.R. w/cap set for a corner of this survey;

THENCE, N 15°38'17" W a distance of 316.63 feet to a ½" I.R. w/cap set in the North line of said O.B. Holt Pre-Emption survey and in the South line of said J.O. Holt Survey (Vol. 1, Pg. 93, A.C.D.R.) for a North Eastern corner of this survey;

THENCE, N 73° 56'49" E along the South line of said J.O. Holt Survey and the North line of said O.B. Holt Pre-Emption survey a distance of 463.62 feet to a ½" I.R. found w/ T-post for a NE corner of said O.B. Holt Pre-Emption survey and a corner of this survey;

THENCE, N 73° 55'56" E along the North line of said 7.327 acre survey a distance of 213.03 feet to a ½" I.R. found for a NE corner of said 7.327 acre survey and a NE corner of this survey;

THENCE, S 15°26'45" E a distance of 49.40 feet to a ½" I.R. found for a NE corner of said 7.327 acre survey and a corner of this survey;

THENCE, N 74°39'35" E along the North line of said 7.327 acre survey a distance of 29.60 feet to the point of beginning.

Containing 3.61 acres of land.

James E. Tompkins R.P.L.S. 1985

April 05, 2011

WTC48144-J.T.A.

**THE STATE OF TEXAS**
**COUNTY OF ANDREWS**

I hereby certify that this instrument was FILED on the
date and the time stamped hereon by me and was duly
RECORDED in the OPR Records of Andrews, Texas.

**16-3496   Pages: 11**
**09/22/2016 02:14 PM**

Kenda Heckler, County Clerk
Andrews, Texas

Plaintiffs' Exs 79

# OPERATING AGREEMENT

OPERATOR: **Secure Salt Water Disposal Systems, LLC.**

LEASEHOLD OWNER: **Jenkins No.1, LLC**

CONTRACT AREA: That Commercial Salt Water Disposal (CSWD) facility known as
Jenkins No. 1 CSWD Facility located on County Road 3001 approximately 4 miles east
of Andrews, Texas  in Andrews County, Texas

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between Secure Salt Water Disposal
Systems (**SSWDS**), hereinafter designated and referred to as
"Operator," and Jenkins Resources, INC, (**Jenkins**) sometimes
hereinafter referred to individually as the "Non-Operator," and
collectively referred to as the "Parties"

**WITNESSETH:**

WHEREAS, Jenkins is the owner of certain CSWD facilities
("Properties"), as described in Exhibit "A," and the Parties hereto
have reached an agreement whereby SSWDS will operate the Properties
for the benefit of Jenkins as hereinafter provided,
NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**

**DEFINITIONS**

As used in this agreement, the following words and terms shall have
the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by
a party to this agreement for the purpose of estimating the costs to
be incurred in conducting an operation hereunder.

B. The term "Contract Area" shall mean all of the lands and facilities
intended to be used for the Commercial Disposal of Salt Water as
described in in Exhibit "A."

C. The term "Deepen" shall mean a single operation whereby a disposal
well is reentered and a new zone in the well is completed for the
purpose of injecting Salt Water. This Deepening must be proposed by
Jenkins in an AFE to the "Consenting Party".

D. The term and "Consenting Party" shall mean a party who agrees to
join in and pay its pro-rata share of the cost of any operation

E. The terms "Non-Consenting Party" shall mean a party who elects not
to participate in a proposed operation.

F. The term "Skim Oil" shall mean oil that has been extracted from the
Salt Water that has been delivered to the CSWD for disposal and other
marketable substances produced therewith.

G. The terms "Lease" and "Leasehold" shall mean the land lying within
the Contract Area leased from the "Surface Owner" for the purpose of
operating a CSWD.

H. "Surface Owner" shall refer to the person or entity that actually
owns the land upon which the CSWD is located.

I. The term "Surface Lease" shall refer to the agreement between
Jenkins and the Surface Owner, whereby Jenkins has agreed to lease the
surface for the purpose of operating a CSWD.

Plaintiffs' Exs 80

J. The term "Injection Interval" shall mean a stratum of earth thought to be capable of accepting significant volumes of Salt Water delivered to the CSWD facility for disposal, as defined in the disposal permit.

K. The term "Operating Costs" shall refer to the day to day expenses incurred in the operating of the CSWD. These day to day costs shall include but are not limited to payments to the surface owner, electricity, chemicals, security, salaries to contract personnel etc. Upon reaching an average volume of 5000 barrel/disposed water/day the monthly Operating Costs will be limited to no more than $.20 per disposed barrel of water. The Operating Cost will not include any salaries or contract fees to any of the owners (including related parties) of Jenkins or 3 Ten, unless owners are filling a budgeted position per Exhibit B.

L. The term "Skim Oil Penalty" shall refer to the penalty deducted by the oil purchaser from the local market price of oil. This penalty is calculated by the purchaser each month by taking the average market price and deducting a fee for transportation and a deduction or addition for the quality of the Skim Oil. The current Skim Oil Penalty is approximately $5.00 per barrel.

M. The term "Royalty" shall refer to the percentage of revenue paid to the Surface Owner as described in the Surface Lease

N. The term "Participant" shall refer to any party that has been granted a net revenue interest in the Properties.

**ARTICLE II.**
**EXHIBITS**
The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
A. Exhibit "A," shall include the following information:
(1) Description of lands subject to this agreement,
(2) Parties to this Agreement with addresses and telephone numbers for notice purposes,
(3) Percentages or fractional interests of parties to this Agreement,
B. Exhibit "B," Estimated Expense Budgets
C. Exhibit "C," Insurance Coverages.
D. Exhibit "D," CSWD Permit

**ARTICLE III.**
**INTERESTS OF PARTIES**
**A. Interests of Parties in Costs and Production:**
Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by Jenkins, as their interests are set forth in Exhibit "A." In the same manner, Jenkins shall also own all Revenue from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

**ARTICLE IV.**
**OPERATOR**
**A. Designation and Responsibilities of Operator:**
**Secure Salt Water Disposal Systems, Inc. Until such time as the board
shall select a new Operator**, SSWDS shall be the Operator of the
Contract Area, and shall conduct and direct and have full control of
all operations on the Contract Area as permitted and required by, and
within the limits of this agreement. In its performance of services
hereunder for Jenkins, Operator shall be an independent contractor not
subject to the control or direction of Jenkins except as to the type
of operation to be undertaken in accordance with the election
procedures contained in this agreement. Operator shall not be deemed,
or hold itself out as, the agent of Jenkins with authority to bind
them to any obligation or liability assumed or incurred by Operator.
Operator shall conduct its activities under this agreement as a
reasonable prudent operator, in a good and workmanlike manner, with
due diligence and dispatch, in accordance with good and water disposal
practices, and in compliance with applicable law and regulation, but
in no event shall it have any liability as Operator to Jenkins for
losses sustained or liabilities incurred except such as may result
from gross negligence or willful misconduct. In consideration for
carrying out its duties as Operator, Jenkins will pay the Operator the
actual (substantiated) costs incurred in operating the Properties with
a maximum cap on those costs of $0.20 per barrel of water processed
(Once a volume of 5,000 barrels/day has been achieved). The Operator
will be paid on a monthly basis.
**B. Resignation or Removal of Operator and Selection of Successor:**
1. Resignation or Removal of Operator: Operator may resign at any time
by giving 90 days written notice thereof to Jenkins.
If Operator terminates its legal existence, or is no longer capable of
serving as Operator, Operator shall be deemed to have resigned.
Operator may be removed by a majority vote by the Jenkins Board Any
resignation or removal shall not become effective until 7:00 o'clock
A.M. on the first day of the calendar month following the expiration
of ninety (90) days after the giving of notice of resignation by
Operator or action by Jenkins to remove Operator, unless a successor
Operator has been selected and assumes the duties of Operator at an
earlier date.
2. Selection of Successor Operator: Upon the resignation or removal of
Operator under any provision of this agreement, a successor Operator
shall be selected by Jenkins.
**C. Employees and Contractors:**
The number of employees or contractors used by Operator in conducting
operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Jenkins;
however, all such employees or contractors shall be the employees or
contractors of Operator.
**D. Rights and Duties of Operator:**
1. Competitive Rates and Use of Affiliates: All work shall be
performed by Operator under the same terms and conditions as are
customary and usual in the area in contracts of independent
contractors who are doing work of a similar nature.

All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge Jenkins. Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect to the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of Jenkins any funds advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of Skim Oil from the Contract Area; and, such funds shall remain the funds of Jenkins on whose account they are advanced or until used for their intended purpose or otherwise delivered to Jenkins or applied toward the payment of debts. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Jenkins for any purpose other than to account for Jenkins funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Jenkins unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit Jenkins or its duly authorized representative, at Jenkins's sole risk and cost, full and free access at all reasonable times to all operations of every kind being conducted for the joint account on the Contract Area; and, to the records of operations conducted thereon, including Operator's books and records relating thereto. In as much as reasonably possible such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder.

Operator will furnish to Jenkins upon request, copies of any and all reports and information obtained by Operator in connection the operation of the CSWD.

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to Jenkins all operational notices, reports or applications required to be filed by local, State agencies or authorities having jurisdiction over operations hereunder. Jenkins shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state of Texas.

Plaintiffs' Exs 83

Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "C" attached hereto and made a part hereof.

Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

## ARTICLE V - NA

## ARTICLE VI. DEEPENING
### A. Establishing Subsequent Disposal Areas within Injection Intervals
1. Proposed Operations: If Jenkins deems it necessary to complete an additional Disposal Area within the existing Injection Intervals in a well for the purpose of providing additional disposal areas in the CSWD, Jenkins shall give written notice of the proposed operation to the participants as to the probable costs of completing the proposed operation. The participants to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify Jenkins as to whether they elect to participate in the cost of the proposed operation as a "Consenting Party". Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation, and such party will be deemed a "Non-Consenting Party".

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein. Jenkins shall notify Operator within thirty (30) days of acceptance of the proposed operation.

Said commencement date may be extended upon written notice by Operator to Jenkins, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits, or to schedule contractors.

2. Operations by Less Than All Parties:
(a) Determination of Participation. If any participant to whom such notice is delivered, elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the participants electing to participate in the operation shall instruct Operator to perform all work for the account of the Consenting Parties.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.

Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of revenue.

Such relinquishment by Non-Consenting Parties shall be effective until the proceeds of the project shall equal the total of the following:
(i) 200 % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and,
(ii) 400% of that portion of the costs and expenses of Reworking the well, which would have been chargeable to such Non-Consenting Party if it had participated therein.

Within ninety (90) days after the completion of any operation under this Article, the Consenting Parties shall furnish each Non-Consenting Party with an itemized statement of the cost of equipment and the costs of Reworking of the well.
Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the revenue generated by the CSWD.
If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to the Non-Consenting Party as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto.
At that time, the Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement.

**B. Abandonment of Wells/facility:**
1. Abandonment of existing disposal wells/facility:
Should Jenkins, after diligent effort, conclude that the existing CSWD well is no longer capable of accepting Salt Water; and, it is not economical to drill a replacement well, or the State of Texas is not willing to permit a replacement well, Jenkins shall notify all participants that the well must be plugged and the lease must be abandoned.

All such wells shall be plugged and abandoned in accordance with
applicable regulations and at the cost, risk and expense of the
parties who participated in the well.

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES
**F. Taxes:**
Beginning with the first calendar year after the effective date
hereof, Operator shall render for ad valorem taxation all property
subject to this agreement which by law should be rendered for such
taxes, and Operator shall notify Jenkins of the tax due and Jenkins
shall pay all such taxes assessed thereon before they become
delinquent.

## ARTICLE VIII. - NA

## ARTICLE IX.- NA

## ARTICLE X. CLAIMS AND LAWSUITS
Operator may settle any single uninsured third party damage claim or
suit arising from operations hereunder if the expenditure does not
exceed TEN THOUSAND AND NO/100 Dollars ($10,000.00) and if the payment
is in complete settlement of such claim or suit. If the amount
required for settlement exceeds the above amount, Jenkins hereto shall
assume and take over the further handling of the claim or suit, unless
such authority is delegated to Operator. All costs and expenses of
handling settling, or otherwise discharging such claim or suit shall
be a joint expense of the parties participating in the operation from
which the claim or suit arises.

## ARTICLE XI.
## FORCE MAJEURE
If any party is rendered unable, wholly or in part, by force majeure
to carry out its obligations under this agreement, other than the
obligation to indemnify or make money payments or furnish security,
that party shall give to all other parties prompt written notice of
the force majeure with reasonably full particulars concerning it;
thereupon, the obligations of the party giving the notice, so far as
they are affected by the force majeure, shall be suspended during, but
no longer than, the continuance of the force majeure. The term "force
majeure," as here employed, shall mean an act of God, strike, lockout,
or other industrial disturbance, act of the public enemy, war,
blockade, public riot, lightening, fire, storm, flood or other act of
nature, explosion, governmental action, governmental delay, restraint
or inaction, unavailability of equipment, and any other cause, whether
of the kind specifically enumerated above or otherwise, which is not
reasonably within the control of the party claiming suspension.
The affected party shall use all reasonable diligence to remove the
force majeure situation as quickly as practicable. The requirement
that any force majeure shall be remedied with all reasonable dispatch
shall not require the settlement of strikes, lockouts, or other labor
difficulty by the party involved, contrary to its wishes; how all such

Plaintiffs' Exs 86

difficulties shall be handled shall be entirely within the discretion of the party concerned.

**ARTICLE XII.**
**NOTICES**
All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, email or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the email address of the party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or Emailed, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, email or facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

**ARTICLE XIII. TERM OF AGREEMENT**
This agreement shall remain in full force and effect as to CSWD Lease subject hereto for as long as Salt water is disposed into the CSWD any time during a 365 day period.

**ARTICLE XIV.**
**COMPLIANCE WITH LAWS AND REGULATIONS**
**A. Laws, Regulations and Orders:**
This agreement shall be subject to the applicable laws of the state of Texas.

Plaintiffs' Exs 87

**ARTICLE XV.**
**MISCELLANEOUS**
This agreement shall be binding upon the Parties when this agreement
or a counterpart thereof has been executed by Jenkins and Operator.
**B. Successors and Assigns:**
This agreement shall be binding upon and shall inure to the benefit of
the parties hereto and their respective heirs, devisees, legal
representatives, successors and assigns, and the terms hereof shall be
deemed to run with the Lease or Interests included within the Contract
Area.
**C. Counterparts:**
This instrument may be executed in any number of counterparts, each of
which shall be considered an original for all purposes.
**D. Severability:**
If any provision of this Agreement or the application thereof to any
person or circumstance shall be invalid, illegal or unenforceable to any
extent, the remainder of this Agreement and the application thereof shall
not be affected and shall be enforceable to the fullest extent permitted
by law.


**EXHIBIT "A"**
**Parties & contact details**
Attached

**EXHIBIT " B "**
**Estimated Budget**
ATTACHED

**EXHIBIT " C "**
**Insurance Coverage**
ATTACHED

**EXHIBIT " D "**
**Permits**
ATTACHED

Plaintiffs' Exs 88

# Secure Salt Water Disposal Systems, Inc.
## Operating Agreement for the:
### Jenkins No.1 Andrews County, Texas

**Operator:**
Secure Salt Water Disposal Systems, Inc.
Group, LLC.

**Leasehold Owner:**                                    Spec-3

By: _____

Harry Sherman - Member

Date: _____

By: _____

Curtis Overstreet-Member

Date: _____


**Leasehold Owner:**
Secure Water Disposal, LLC.

By: _____

Harry Sherman-Member

Date: _____8/26/16_____

Plaintiffs' Exs 89

**Exhibit B**

Jenkins No. 1 Estimated Monthly Operating Budget

| Barrels Water/Day | 5000 | 7500 | 10000 |
|---|---|---|---|
| Personnel | | | |
| **Manager | $5,000 | $5,000 | $5,000 |
| **Worker 1 | $5,000 | $5,000 | $5,000 |
| Worker 2 | $0 | $3,500 | $3,500 |
| Admin | $1,000 | $1,000 | $1,000 |
| Chemicals | $4,500 | $6,500 | $8,500 |
| Internet | $200 | $200 | $200 |
| Supplies | $1,500 | $1,750 | $2,000 |
| Insurance | $2,000 | $2,000 | $2,000 |
| Electricity | $4,000 | $6,000 | $8,000 |
| Site Maintenance | $1,000 | $2,000 | $3,000 |
| Phones | $100 | $100 | $100 |
| Travel | $2,500 | $2,500 | $2,500 |
| Misc | $500 | $500 | $500 |
| **Total** | **$27,300** | **$36,050** | **$41,300** |

**DRAFT**

## JOINT VENTURE AGREEMENT

This JOINT VENTURE AGREEMENT ("Agreement") is made to be effective as of September ___, 2016 (the "Effective Date") by and between Strategic Water Solutions, LLC, a Delaware limited liability company ("SWS"), and Texas Field Water Investment LLC ("TFW") (each, a "Party," and, collectively, the "Parties").

WHEREAS, the Parties desire to invest in, develop and manage various water reclamation Projects (defined below);

WHEREAS, the Parties have entered into that certain letter of intent dated as of September __, 2016, a copy of which is attached as EXHIBIT A, hereto, and incorporated herein by reference (the "LOI")(in the event of a dispute between the terms of this Agreement and the LOI, the provisions of this Agreement shall control); and

WHEREAS, pursuant to the LOI, the Parties have formed and will capitalize Wild West Water Solutions, Inc., a Texas corporation ("WWW") for the purposes set forth herein, and are desirous of fixing and defining between themselves their respective responsibilities, interests, and liabilities in connection with the performance of the Projects.

NOW, THEREFORE, for and in consideration of the foregoing recitals and the mutual promises and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged and confirmed, the Parties agree as follows:

1.      DEFINITIONS

All terms not otherwise defined herein or in other sections of this Agreement shall be construed as such terms are commonly used in the water reclamation/disposal industry.  Unless the context indicates otherwise, section references and the terms "hereunder", "herein", "hereto" or similar references, refer to this Agreement.

1.1     "Affiliate" means, as to either Party, as the case may be, any entity which is wholly-owned by a Party, or by all of the same entities and/or individuals that hold an ownership interest in such Party.

1.2     "Board" means the Board of Directors of WWW and/or any other Venture entity.  The Bylaws of WWW shall be amended to provide for five (5) Directors.  Unless otherwise agreed by the Parties in writing, the Board of WWW shall be appointed as follows:
- 2 Seats shall be held by appointees of Jonathan Koster,
- 2 Seats shall be held by appointees of TFW, and
- The 5th Seat will be voted upon by majority vote of the Board as provided by the By-Laws at the Initial Directors Meeting.

1.3     "Governmental Authority" means any competent federal, state, local, administrative or judicial authority, licensing agencies, and all other governmental entities having jurisdiction over the Parties, this Agreement, the Projects, or any matter related thereto.

1.4     "Sales Exclusivity Fee" refers to the fee paid by TFW to SWS in exchange for WWW and/or any other Venture entity having the exclusive right, during the entire Term of this Agreement, to sell, lease or distribute SWS Products. The Sales Exclusivity Fee shall be $500,000, payable in accordance with this Agreement.

1.5     "Products" means saltwater disposal products.  SWS will sell all Products to the Venture at a price that is no more than ten percent (10%) above SWS's cost for such Products.  All Product sales shall be "open-book" with supporting documentation provided upon request by TFW.

1.6     "Projects" means all aspects relating to the purpose of acquiring existing saltwater disposal facilities, adding wastewater infrastructure/technology, and developing a significant water infrastructure serving the oil and gas industry.  The Parties agree that Projects with Frost Rains Holdings, LLC ("Frost Rains") are exempt in relation to all new site development, and Projects between Frost Rains and SWS and/or any SWS Affiliate shall be excluded from the definition of "Project" herein.

1.7     "Revenues" means all monies received from the performance of a Project, the sell, lease or service of a Product, and Licensing fees and royalties, regardless of source, except as otherwise provided herein.

1.8     "Term of Focus" shall mean the period of 36 months from the Effective Date.

1.9     "Venture" means WWW and any venture, partnership, subsidiary or other entity formed to complete Projects.


## 2. SCOPE AND PURPOSE OF VENTURE.

2.1     <u>Purpose</u>. SWS and TFW are jointly acting to plan the business and organizational activities of WWW through formalization of a business plan; amended governance documents; regulatory compliance including state and federal authority, permit and certification processes; finance structure; and other production water related issues.  SWS and TFW intend to construct, through this Agreement, the basic structure of the WWW and credit TFW with certain capital contributions as set forth below.  SWS and TFW acknowledge that additional and further agreements shall be executed by and among SWS, TFW, WWW, and the principles, agents, members, shareholders, and officers identified herein ("Contracting Parties").  The overriding purposes of such efforts by the Contracting Parties is for TFW to realize the benefit of its cash infusion; SWS to benefit the Contracting Parties through use and further development of patented technology ("License Agreement"), and the lawful, stated purposes of the respective agreements.

2.2     <u>Focus</u>. Jonathan Koster and David West (collectively, the "Officers"), serving as officers of WWW, shall primarily focus their efforts on the day to day operations of WWW for a period of 36 months ("Term"), limiting their involvement in projects and companies outside of WWW to advisory roles only, and not daily management responsibilities.  During the Term, SWS shall use its best efforts and primarily commit its resources to growth and development of WWW's business operations including negotiating and executing contracts for sales of treated and untreated production water and related products; sales, licensing, leasing of water treatment and disposal technology and services within the oil and gas industry.  This does not limit the Officers' nor SWS's involvement in other business in an advisory capacity (e.g., providing technology/IP/know-how, etc.). This does limit the Officers from taking on daily management responsibilities that would hinder their ability to structure, organize and operate WWW and ensuring its success.  Nothing in this provision is intended to limit or prevent Officers from delegating operational management and responsibility to one or more persons to focus on SWS operational activities unrelated to WWW.  During the Term, all SWS projects in the oil and gas industry,

2

with the exception of projects funded by Frost Rains Holdings, LLC, will be operated by WWW or another Venture entity in which TFW holds an interest equal to or greater than its stake in WWW..

    2.3   <u>Additional Documents</u>.  The Parties understand and agree that the transactions envisioned herein necessitate the negotiation and execution of additional agreements and documents, and agree to cooperate in the preparation and execution of such additional documents as requested by the Officers and/or the Board of Directors.  These additional documents may include, without limitation:  Board and/or shareholder resolutions and consents, buy-sell/shareholder agreements, license agreement(s), banking arrangements and agreements, equipment lease and/or purchase agreements, and employment/compensation agreements.

## 3. TERM.

    This Agreement shall be effective upon execution until all corporate, organizational finance, employment, operational documents and other tasks e "Term" of the Venture and of this Agreement shall begin on the Effective Date, and shall continue until terminated by a unanimous vote of the shareholders of WWW following substantial completion of the items set forth in paragraph 2.1 above.

## 4. CAPITAL AND OWNERSHIP.

    4.1   <u>Capital Contributions</u>.  The capital of the Venture shall be contributed in materials and labor by the Parties to be provided to the Venture in connection with the Projects.   In addition, TFW shall provide capital injection for cash flow and asset acquisition purposes as provided below.  The Parties acknowledge that TFW provided $325,000.00 as seed capital for WWW operations and shall receive just credit in such amount under applicable company by-laws or resolution and generally accepted accounting principles.  fund WWW with a total cash amount of $1,050,000, and extend a Line of Credit for $300,000 according to the following schedule (Note, "Day 1" equals the Effective Date hereof):

| **Due Date of Payment (days following execution)** | **Amount** | **Form of Contribution** | **Purpose and Use of Funds** |
|---|---|---|---|
| | $525,000.00 | Cash | Lease acquisition, renovation and operation of Jenkins, LLC, as per Addendum A of the LOI.  Includes a portion of the Sales Exclusivity Fee of $200,000 to SWS |
| | $300,00.00 | Line of Credit | Cash flow and operations.  Disbursement over $10,000.00 must be approved by TFW and Jonathan Koster |
| | $200,00.00 | | $150,00.00 for Sales Exclusivity Agreement, $50,000.00 Compensation Bonus to John Davis |
| | | | |
| | | | |

Plaintiffs' Exs 93

4.2   Ownership Interests.   In exchange for the Capital Contributions described above, equity ownership of WWW shall be allocated as follows in relative percentage of issued (the "Ownership Interests"):

| | |
|---|---|
| SWS | 65% |
| TFW | 35% |

The above Ownership Interests will be issued through the production of stock certificates in accordance with WWW's By-Laws, provided each Party has complied with its obligations herein as of such time.

4.3   Capital Accounts. Each Party's respective Capital Account shall each be credited with the appropriate value of such Party's contribution in accordance with their Ownership Interests.  Except as otherwise required by law or this Agreement, the Parties shall not be required to make any further capital contributions to the Venture absent unanimous consent to same.

5. COMPENSATION; PROFIT AND LOSS.

5.1   Sales Pipeline.   Compensation to SWS for business development and existing contacts and related pipeline sales and development efforts made prior to formation of WWW (the "Pipeline Projects") will be executed by WWW as a WWW Project, and compensation for such Pipeline Projects will be paid as follows (the "Pipeline Commission"):

- SWS will define Pipeline Projects with qualified customers, strategic partners and investors within seven days of the Effective Date hereof.
- Pipeline Commissions apply to sales during the first 12 months after the Effective Date, or when Pipeline Commissions reach a total of $10 million, whichever is first.
- Applies to licensing fees, product sales and any monetization of a contract or tax credit.
- Applies to initial "Point of Sale" amount, but not any royalties or residual revenue generated.
- Does not apply to existing SWS lease and service agreements, only new WWW business.
- Does not apply to residual revenue of SWS, only new WWW business (i.e. Frost Rains).
- All existing Pipeline deals will be executed through WWW.  WWW will disburse the 65% of the Gross Margin to SWS as Pipeline Commission. "Gross Margin" means "Point of Sale Amount" less all direct expenses (i.e., both hard and soft costs).
- Remainder of Gross Margin to be retained by WWW as Revenue.

5.2   Profit and Loss Allocation.   Allocations of profit and loss, determined using GAAP, shall be made in accordance with Ownership Interests, unless otherwise agreed in writing by the Parties.

5.3   Distributions.   Distributions of WWW profits shall be made at the discretion of the Board.

5.4   John Davis.   Both parties agree that John Davis (JD) has provided services of value to the transaction outlined in the LOI, and shall JD shall be retained as an executive employee, subject to employment agreement.   Such agreement shall be consistent with the duties and terms outlined in preliminary discussions.  JD shall also receive the compensation stated in section 4.1 above.

6.   INTELLECTUAL PROPERTY.

6.1   Pre-Existing IP.   Each Party acknowledges and agrees that, as between the Parties, each Party is and shall remain the sole and exclusive owner of all right, title, and interest in and to its Pre-Existing IP, and that this Agreement does not affect such ownership.  Each Party acknowledges that it

4

Plaintiffs' Exs 94

acquires no rights under this Agreement to the other Party's Pre-Existing IP other than the limited rights explicitly granted in this Agreement.  For purposes of this Agreement, "Pre-Existing IP" means all Intellectual Property Rights owned by a Party as of the Effective Date of this Agreement.

6.2     Venture IP.  With respect to any new Intellectual Property Rights created by or in connection with the Venture, and all improvements to Pre-Existing IP made as a result of this Agreement, and all associated Intellectual Property Rights therein (collectively, all the aforementioned are "Venture IP"), each Party acknowledges that SWS is the sole owner in such Venture IP.  Both Parties agree to execute all necessary documents to reflect such ownership.

6.3     Intellectual Property Rights.  For purposes of this Agreement, "Intellectual Property Rights" means, wherever existing (a) all inventions and improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith; (d) all trade secrets and confidential business information; (e) all domain names, URLs or Internet websites; (f) all other proprietary rights; and (g) all copies, translations, and tangible embodiments thereof (in whatever form or medium).

7. MANAGEMENT DUTIES AND RESTRICTIONS.

7.1     Officers. The Board shall appoint officers and other persons to handle all day-to-day executive, administrative, management and financial operations of the Venture (the "Managers").

Management responsibilities for WWW will be conducted by with the current management team as follows:
- Jonathan Koster          Chief Executive Officer
- David West               Chief Operating Officer
- John Davis               Chief Strategy Officer
- Britt Wirt               Chief Investment Officer

7.2     Duties of Managers. Subject to Section 7.4, below, the Managers shall be in charge of the Projects and the Venture.  The Managers may execute any and all documents, agreements, and the like with respect to the Projects.  The Managers may delegate or otherwise appoint agents or employees through whom they shall direct charge and supervision of all matters necessary and connected with the performance of the Projects.

7.3     Delegation.  Notwithstanding the above, authority to act for and bind the Venture and the Parties in connection with any and all of the performance of a Projects may be delegated in writing by the Board to any designated individual(s) or entity(ies).

7.4     Limits of Authority.  Except as authorized by the Board, neither Party shall, on behalf of the Venture, borrow or lend money, or make, deliver, or accept any commercial paper, or execute any mortgage, security agreement, bond, or lease, or purchase or contract to purchase, or sell or contract to sell any property for or of the Venture, or otherwise bind or contractually obligate the Venture or the other Party.

7.5     Venture Checking Accounts.  All funds of the Venture shall be deposited in such checking

Plaintiffs' Exs 95

account or accounts of the Venture entity, as such shall be designated by the officers of the Venture, and shall be kept separate from other funds of any Party. All withdrawals therefrom are to be made upon checks signed by an authorized officer of the Venture entity.

7.6   Venture Books and Records.  The Venture books shall be maintained at the principal office of the Venture, and each Party shall have access thereto during standard business hours. The books shall be kept on a calendar year basis, commencing on January 1st and ending December 31st, and shall be closed and balanced at the end of each fiscal year. A Party may audit the Venture's records and books no more often than once every twelve months.  Any Party requesting such an audit shall bear all audit expenses. In addition, upon completion of a Project, a final audit shall be made and copies of such audit shall be furnished to each of the Parties, with the Parties sharing equally in the cost of such audit.  It is understood and agreed that the method of accounting used by the Venture and for state and federal income tax purposes shall be the cash based method for tax purposes and accrual for management purposes.

7.7   Specific Duties.  Without limiting the above, Management shall specifically include the acquisition of an existing saltwater disposal well (SWD).  Identified site is owned by Jenkins, LLC, located in Andrews, TX.  WWW will gain and hold a 50% interest in Jenkins, LLC as more specifically described in Addendum A to the LOI (the "Jenkins Interest").

7.8   Assurances Regarding Compliance with Laws.  In the event WWW, or any affiliate thereof, elects to market, solicit, or negotiate with any entity or individual regarding sales of interests, units, shares, or other securities, the Officers will assure compliance with the laws of the United States, Texas, and any other allocable jurisdiction(s) regarding the promotion or sales thereof.  Any such offering should comply with the exempt issuance requirements of Regulation D of the Securities Act of 1933 and applicable state(s) laws.  However, in the event compliance with Regulation D is not possible or feasible, then the Officers shall assure full compliance with the registration requirements of US and State securities regulation acts.

8.   WARRANTY; INDEMNIFICATION; LIMITATION OF LIABILITY

8.1   Warranty.  Each Party expressly represents and warrants that, as of the Effective Date and throughout the Term of this Agreement, it:  (1) if a legal entity, it will remain a duly formed legal entity in good standing with its state of formation; (2) is not and will not be in violation of any other agreement or obligation by entering into or performing its obligations in connection with this Agreement; and (3) it possesses and shall maintain all necessary permits, Sales Exclusivity s, and other approvals necessary to perform its obligations pursuant to this Agreement and any services related to a Projects.

8.2   Indemnification.  Each Party hereby agrees to indemnify, defend and hold the other Party harmless from any and all asserted or threatened liabilities, claims, suits, judgments, losses, damages, fines, forfeitures, assessments, costs and expenses, including reasonable attorneys' fees, expert fees and costs and expenses of appeal (collectively, the "Damages"), asserted by third parties as resulting from, arising out of or in collection with (i) the Party's performance or non-performance of any of its obligations and duties set forth in this Agreement, including but not limited to any Damages caused by the negligent, intentional or wrongful acts or omissions to act of a Party, its officers, directors, agents, employees, representatives, or subscribers; (ii) a Party's breach of any warranty, covenant or representation made by it herein; (iii) bodily injury or death or damage to property resulting or claimed to result, in whole or in part, from any willful, intentional or negligent act or omission of a Party, its officers, directors, agents, employees, representatives or its subscribers; or (iv) violation by a Party; its officers, directors, agents, employees, representatives, or subscribers of any law, statute, ordinance, governmental order, rule or regulation.

Plaintiffs' Exs 96

8.3     <u>LIMITATION OF DAMAGES</u>.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE LOSS OR DAMAGE OF ANY KIND, INCLUDING LOST PROFITS (WHETHER OR NOT THE LIABLE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES) BY REASON OF ANY ACT OR OMISSION IN ITS PERFORMANCE UNDER THIS AGREEMENT.  EACH PARTY'S LIABILITY TO THE OTHER SHALL BE LIMITED TO DIRECT DAMAGES SUFFERED BY THE INJURED PARTY WHICH ARE THE PROXIMATE RESULT OF THE LIABLE PARTY'S WILLFUL ACT OR OMISSION.

9.     NON- CIRCUMVENTION; NON-COMPETITION; CONFIDENTIALITY

9.1     <u>Non Circumvention</u>. It is anticipated that, during the course of dealings, each Party (in such instances the Party releasing the information to the recipient Party shall be considered the "<u>Disclosing Party</u>") will reveal to the other Party certain strategies and business methods, as well as business associates, entities, clients, vendors, employees, prospects, agents and other contact information (each, a "<u>Designated Party</u>") which are the proprietary information and property of the Disclosing Party. During and for a period of three (3) years following the Termination of this Agreement, the recipient Party will not have any right to consummate a transaction with a Designated Party, and the recipient agrees not to circumvent, attempt to circumvent, or permit any other Party or persons on its respective behalf to circumvent the Disclosing Party in any way, manner or form regarding any transaction involving any Designated Party during the term of this Agreement. The recipient agrees to conduct all of its transactions with any Designated Party through the Disclosing Party during the term of this Agreement and not to contact, call on or solicit, either directly or indirectly, any Designated Party of the Disclosing Party during the term of this Agreement.

9.2     **Confidential Information**

9.2.1   "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects, including without limitation, (a)the identity of the Disclosing Party's customers, prospective customers, suppliers of goods or services, and others with whom the Disclosing Party has a business relationship; (b)the needs, preferences or requests of the Disclosing Party's customers, prospective customers, suppliers of goods or services, and others with whom the Disclosing Party has a business relationship; (c)pricing, product, service and marketing information; (d)software, research, inventions, processes, designs, drawings, engineering information, hardware configuration information, and proprietary technology information; (e)financial information; (f)special processes, policies and procedures of the Disclosing Party; (g)customer, prospective customer and contact lists and databases; (h)manuals, contracts and fee arrangements; (i)correspondence with customers, prospective customers, suppliers of goods or services, and others with whom the Disclosing Party has a business relationship; (j) company and customer profiles; (k) methods of operation; (l) business projections and/or business plans; and (m) any other information which the recipient party has reason to believe the Disclosing Party would not want disclosed to the public or to a third party, or tending to give the Disclosing Party a commercial advantage.  Confidential Information shall not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the Disclosing Party; (ii) becomes publicly known and made generally available after disclosure by the Disclosing Party to the Receiving Party through no action or inaction of the Receiving Party; (iii) is already in the possession of the Receiving Party at the time of disclosure by the Disclosing Party as shown by the Receiving Party's files and records immediately prior to the time of disclosure; (iv) is obtained by the Receiving Party from a third party without a breach of such third party's obligations of confidentiality; or (v) is required by law to be disclosed by the Receiving Party, provided that the Receiving Party shall give the Disclosing Party written notice

Plaintiffs' Exs 97

of such requirement prior to disclosure so that the Disclosing Party may seek a protective order or other appropriate relief.

    9.2.2  <u>Non-Disclosure of Confidential Information</u>. During and for a period of three (3) years following the Termination Date of this Agreement Each party agrees not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties. Each party agrees not to disclose any Confidential Information of the other party to third parties or to such party's employees, officers, directors, agents, advisors, lenders, accountants and attorneys (collectively "<u>Agents</u>"), except to those Agents of the Receiving Party who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship. Neither party shall reverse engineer, disassemble or decompile any prototypes, software or other tangible objects which embody the other party's Confidential Information and which are provided to the party hereunder. To the extent either party breaches this agreement by using the other party's Confidential Information in a non-permissible way, any inventions, improvements, or other intellectual property resulting from such non-permissible use will be the property of the non-breaching party. The breaching party will and does hereby automatically assign, grant and convey to the non-breaching party any and all rights, title and interest in such new intellectual property, at the time of creation of any such work, without a requirement of further consideration, and regardless of any right, title or interest the breaching party may have in _any such work. The breaching party further agrees that upon request, the breaching party will execute a written assignment of such new intellectual property to the non-breaching party.

    9.2.3  <u>Maintenance of Confidentiality</u>. Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other party. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information (which shall not be less than measures requiring strict confidence) and shall ensure that its Agents who have access to Confidential Information of the other party have signed a non-disclosure agreement having provisions at least as restrictive as those in this Agreement, prior to any disclosure of Confidential Information to such Agents. Neither party shall make any copies of the Confidential Information of the other party unless the other party approves the same previously in writing. Each party shall reproduce the other party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original.

    9.3    <u>Non-Compete</u>. The Parties hereto agree they will not enter into conflict of interest transactions or compete with the business of WWW during the term of this agreement. This provision shall not be interpreted as limiting, defeating, or terminating any fiduciary duties owed by the parties and their respective agents, members, managers, officers, board members, or employees to WWW or its shareholders.

    9.4    <u>Conduct of the Parties</u>. Each Party agrees to use its best efforts to preserve the goodwill and reputation of the other Party. Each Party agrees to notify the Disclosing Party of all inquiries about proposed transactions from a Designated Party. The parties further agree that this Agreement and the respective obligations hereunder shall be binding upon the respective owners, officers, employees and any other representative or agent who might financially benefit from transactions under this Agreement.

    9.5    <u>Remedies</u>. Each Party agrees that its obligations hereunder are necessary and reasonable in order to protect the other Party and the other Party's business, and expressly agrees that monetary damages would be inadequate to compensate the other Party for any breach by either Party of any covenants and agreements set forth herein. Accordingly, the parties shall be entitled to equitable relief to compel the receiving Party to cease and desist all dealings with a Designated Party. Moreover, each Party agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to

8

the other Party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the other Party shall be entitled to obtain both temporary and permanent injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of posting bond or other security (*to the extent that either Party is required to post bond or other security, the parties agree and stipulate that $1,000 is sufficient for such bond or other security*) or proving actual damages.

## 10. TERMINATION.

10.1   Termination. The Venture may be dissolved: (1) at any time by agreement of the Parties, or (2) in accordance with law and the governing documents of WWW.  In any event of Termination, the Parties shall proceed with reasonable promptness to liquidate the business of WWW or consummate whatever agreement(s) underlying the winding up and dissolution of WWW.

10.2   Return of IP.  Upon Termination of this Agreement, all IP in TFW's or Venture's possession shall be immediately returned to SWS, at TFW's or Venture's expense (as appropriate), subject to the survival of any rights

10.3   Sale and Division of Assets. Upon winding up of the Venture, the assets of the Venture business shall be used and distributed in accordance with state law and the governing documents of the Venture.

## 11.   MISCELLANEOUS

11.1   Notices.  All notices, requests, demands or other communications required by this Agreement shall be in writing and shall be deemed to have been duly given to any Party when delivered: (1) personally (by courier service or otherwise) or via email, (2) by facsimile and confirmed by return facsimile, (3) by an internationally recognized overnight courier service, or (4) by registered or certified mail, postage prepaid and return receipt requested, in each case to the applicable addresses set forth below:

If to SWS:

Strategic Water Solutions, LLC
Attn: _____
_____
_____
Fax _____
Email: _____

If to TFW:

Attn: _____
_____
_____
Fax _____
Email: _____

11.2   Governing Law/Forum Selection. THIS AGREEMENT WILL BE CONSTRUED AND GOVERNED IN ACCORDANCE WITH THE UCC AS ADOPTED AND INTERPRETED BY THE STATE OF TEXAS WITHOUT APPLICATION OF CHOICE-OF-LAW PROVISIONS THAT WOULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. THE PARTIES AGREE THAT ALL CLAIMS AND DISPUTES RELATING TO OR ARISING

Plaintiffs' Exs 99

UNDER THIS AGREEMENT THAT CANNOT BE SETTLED THROUGH NEGOTIATION BETWEEN THE PARTIES THEMSELVES SHALL BE SETTLED BY ARBITRATION IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED BY ANY COURT HAVING JURISDICTION THEREOF. THE ARBITRATION SHALL BE CONDUCTED IN AUSTIN, TEXAS. THE PARTIES AGREE THAT THE COURTS OF THE STATE OF TEXAS SHALL HAVE JURISDICTION TO ENTER AND ENFORCE ANY SUCH ORDERS.

11.3     <u>Relationship of the Parties</u>.  Except as provided herein or by separate written agreement between the Parties, neither Party shall be deemed to be an employee or contractor of the other Party, nor shall a Party be deemed to be the legal representative or agent of the other Party for any purpose whatsoever. No provision of this Agreement shall be construed as vesting in either Party any control whatsoever in any facilities and operations of the other Party, including the operations of any Party Affiliate or contractual third party of the other Party.

11.4     <u>Assignment/Delegation</u>.  Except as set forth below, no Party may sell, assign or transfer this Agreement or its obligations hereunder absent written consent from the other Party. Notwithstanding the foregoing, each Party may delegate duties (and assign the rights to receipts) under any portion of this Agreement to any Affiliate.  No delegation of duties shall relieve a Party of its liabilities and obligations hereunder. Subject to the provisions of this Section, all rights and duties of the Parties hereunder shall inure to the benefit of their respective successors and assigns.

11.5     <u>Waiver</u>.  The observance of any term of this Agreement may be waived only with the written consent of the Party against whom such waiver is sought to be enforced. No waiver by any Party of any default with respect to any provision, condition or requirement hereof shall be deemed to be a continuing waiver in the future or a waiver of any other provision, condition or requirement hereof.

11.6     <u>No Third Party Beneficiaries</u>.  This Agreement is not intended to and shall not be construed to provide any rights, remedies or benefits to or for any person or entity not a Party to this Agreement.

11.7     <u>Severability</u>.  If any provision of this Agreement is held invalid, unenforceable or void, the remainder of the Agreement shall not be affected thereby and shall continue in full force and effect.

11.8     <u>Full Integration; Amendments in Writing</u>.   This Agreement constitutes the entire agreement between the Parties relating to the matters set forth herein. No prior or contemporaneous written, oral, and electronic representation, negotiation, or agreement form a part of this Agreement, and this Agreement supersedes all prior written, oral, or electronic agreements between the Parties relating to this Agreement.  No amendment, modification, or supplement to this Agreement shall be effective unless it is in writing and signed by the Parties.

11.9     <u>Counterparts</u>.  The Parties may execute this Agreement in two or more counterparts, which shall, in the aggregate, be signed by each Party.  Each counterpart shall be deemed an original instrument as against any Party who has signed it.

11.10    <u>Force Majeure</u>.  Neither Party shall be liable or deemed to be in default for a delay in or failure of performance of its obligations that results from any unforeseeable event, including but not limited to the following causes beyond the reasonable control of such Party: acts or omissions by third parties, power outages, fire flood, fiber cut, radio frequency interference, strikes, work stoppages, shortages of equipment, supplies or energy, war, insurrection, acts of God or the public enemy, or any new and unforeseen actions by Governmental Authorities (whether in its sovereign or contractual capacity), and similar rules, regulations, laws, ordinances, or restrictions. Any delay resulting from any such cause shall extend performance accordingly or excuse performance, in whole or in part, for such time as may be reasonable; *provided, however,* that (i) such causes shall not excuse payment of any

Plaintiffs' Exs 100

amounts due or owed at the time of such occurrence or thereafter, (ii) the Party asserting any such cause shall promptly commence and diligently pursue action to remedy its inability or failure to perform hereunder, and (iii) in no event shall such causes extend or excuse performance for more than 120 days. Any Party asserting this Section shall promptly notify the other Party of the occurrence and nature of any such cause and shall thereafter regularly inform the other Party of the progress of actions to remedy its inability or failure to perform hereunder.

11.11   <u>Compliance with Laws</u>.  The Parties agree that, in connection with this Agreement, each Party will fully comply with all laws and regulations, license requirements and related rules governing each respective Party.

*[Signature Page Follows]*

11

Plaintiffs' Exs 101

IN WITNESS WHEREOF, the Parties AGREE to the above terms to be effective as of the Effective Date:

_____

**"TFW"**

By: _____
    Name:
    Title:

    Date:  September \_\_\_, 2016.

**STRATEGIC WATER SOLUTIONS, LLC**

**"SWS"**

By: _____
    Name:
    Title:

    Date:  September \_\_\_, 2016.

12

Plaintiffs' Exs 102

**DRAFT**

EXHIBIT A

**Letter of Intent**

**[Attached]**

Plaintiffs' Exs 103